ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1030 (consolidated with 23-1285 and 23-1337)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN GAS ASSOCIATION, *et al.*,

*Petitioners*,

*v.*

U.S. DEPARTMENT OF ENERGY, *et al.*,

*Respondents*,

CITY OF NEW YORK, *et al.*,

*Respondent-Intervenors*.

_____

On Petition for Review of Final Rules
of the U.S. Department of Energy
_____

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**
_____

(Names and addresses of counsel appear inside cover.)

Date: April 16, 2024

Andrew R. Varcoe
Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

Jeremy C. Marwell
Nathan Campbell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com
Email: ncampbell@velaw.com

*Counsel for* Amicus Curiae
*the Chamber of Commerce of the United States of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* the Chamber of Commerce of the United States of America submits this certificate as to parties, rulings, and related cases.

### A. PARTIES AND AMICI

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the certificate filed by Petitioners the American Gas Association; the American Public Gas Association; the National Propane Gas Association; Thermo Products, LLC; Spire, Inc.; Spire Alabama Inc.; and Spire Missouri Inc.

The Chamber of Commerce of the United States of America is submitting this *amicus* brief in support of Petitioners.

### B. RULINGS UNDER REVIEW

References to the rulings at issue appear in the certificate filed by Petitioners.

### C. RELATED CASES

Related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C) are listed in the certificate filed by Petitioners. *Amicus* is not aware of any additional related cases within the meaning of Rule 28(a)(1)(C).

Date: April 16, 2024

Respectfully submitted,
*/s/ Jeremy C. Marwell*

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for* Amicus Curiae

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amicus curiae*, through undersigned counsel, certifies as follows:

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Date: April 16, 2024

Respectfully submitted,
*/s/ Jeremy C. Marwell*

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COUNSEL REGARDING
## AUTHORITY TO FILE AND SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and (3), the Chamber of Commerce of the United States of America has filed an unopposed motion for leave to participate in this matter as *amicus curiae*.

Pursuant to D.C. Cir. R. 29(d), counsel for *amicus* hereby certify that no other non-government *amicus* brief of which they are aware focuses on the subjects addressed here, i.e., the potential broader effects of the Department of Energy's challenged rulemakings on the American business community, and the larger significance of those rulemakings (and the underlying legal principles on which they rest) to a wide range of consumer and commercial appliances regulated under the Energy Policy and Conservation Act ("EPCA") and upon which many businesses and consumers rely. In its capacity as a nationwide business association whose members manufacture, sell, or use a wide range of products subject to energy and water efficiency standards promulgated pursuant to EPCA, *amicus* is well-suited to provide the Court important context on these subjects that will assist it in resolving this case. *Amicus* has endeavored to avoid duplication in briefing.

Date: April 16, 2024

Respectfully submitted,
*/s/ Jeremy C. Marwell*

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases .................................................i

Corporate Disclosure Statement ........................................................................... iii

Certificate of Counsel Regarding Authority to File and Separate Briefing .............iv

Table of Authorities ........................................................................................... vii

Glossary .............................................................................................................xi

Statutes and Regulations.....................................................................................xi

Identity and Interest of *Amicus Curiae* ..................................................................1

Introduction and Summary of Argument.................................................................2

Argument ...........................................................................................................6

    I.     Under EPCA, "performance characteristics" include space- and installation-related characteristics. ...........................................................6

    II.    If upheld here, DOE's cramped interpretation of "performance characteristics" will have broad negative ramifications going forward.........................................................................................16

Conclusion ........................................................................................................23

Certificate of Compliance....................................................................................25

Certificate of Service .........................................................................................26

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Beecham v. United States*,
    511 U.S. 368 (1994).................................................................9, 11

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
    562 U.S. 277 (2011)......................................................................14

*Emory v. United Air Lines, Inc.*,
    720 F.3d 915 (D.C. Cir. 2013).......................................................9

*Louisiana v. DOE*,
    90 F.4th 461 (5th Cir. 2024) ....................................................3, 11

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1364 (D.C. Cir. 2007)....................................................9

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)..................................................................8, 11

**Statutes:**

42 U.S.C. § 6291(2) ..............................................................16

42 U.S.C. § 6292(a) ...........................................................2, 16

42 U.S.C. § 6295 ......................................................................2

42 U.S.C. § 6295(a)(2)...........................................................13

42 U.S.C. § 6295(d)(4)(A)(ii) ...............................................12

42 U.S.C. § 6295(f)(1) ...........................................................12

42 U.S.C. § 6295(f)(2) ...........................................................12

42 U.S.C. § 6295(*l*)(1) ...........................................................13

42 U.S.C. § 6295(o) ...............................................................13

42 U.S.C. § 6295(o)(2)(A) .......................................................2

42 U.S.C. § 6295(o)(2)(B)(i) ...................................................2

**Statutes—Continued:**                                          **Page(s)**

42 U.S.C. § 6295(o)(2)(B)(i)(IV) ...................................................3

42 U.S.C. § 6295(o)(4)........................................ 3, 6, 7, 9, 11, 13, 16

42 U.S.C. § 6295(q)(1) ...............................................................13

42 U.S.C. § 6295(q)(1)(B) ................................................ 3, 7, 11

42 U.S.C. § 6311(1) ......................................................................2

42 U.S.C. § 6313 ...........................................................................2

42 U.S.C. § 6313(a)(6)(A)(ii)(II) .................................................2

42 U.S.C. § 6313(a)(6)(B)(ii) ......................................................2

42 U.S.C. § 6313(a)(6)(B)(ii)(IV) ...............................................3

42 U.S.C. § 6313(a)(6)(B)(iii)(II)(aa)................................ 3, 6, 8, 11, 16

42 U.S.C. § 6313(c) .....................................................................12

42 U.S.C. § 6313(d)(1)................................................................12

Energy Independence and Security Act of 2007,
    Pub. L. No. 110-140, 121 Stat. 1492 ...................................17

National Appliance Energy Conservation Act of 1987,
    Pub. L. No. 100-12, 101 Stat. 103 .......................................10

**Regulations:**

10 C.F.R. § 430.32(a).................................................................21

10 C.F.R. § 430.32(c)........................................................... 15, 21

10 C.F.R. § 430.32(d) .................................................................22

10 C.F.R. § 430.32(h)(3)..............................................................19

10 C.F.R. § 430.32(i) ..................................................................20

10 C.F.R. § 430.32(s)(2)(iii)........................................................22

**Regulations—Continued:**                                                      **Page(s)**

10 C.F.R. Part 430, App. U .................................................................................22

Energy Conservation Program for Appliance Standards: Energy
    Conservation Standards for Residential Furnaces and Commercial Water
    Heaters, Notification of Final Interpretive Rule, 86 Fed. Reg. 73,947
    (Dec. 29, 2021) ................................................. 4, 7, 13, 14, 15, 20, 22

Energy Conservation Program for Consumer Products: Energy Conservation
    Standards for Ceiling Fans, 82 Fed. Reg. 6,826 (Jan. 19, 2017).......................22

Energy Conservation Program for Consumer Products: Energy Conservation
    Standards for Water Heaters, 66 Fed. Reg. 4,474 (Jan 17, 2001) ......................22

Energy Conservation Program: Energy Conservation Standards for
    Commercial Water Heating Equipment, 88 Fed. Reg. 69,686 (Oct. 6,
    2023) ...................................................................................... 4, 5, 7

Energy Conservation Program: Energy Conservation Standards for
    Consumer Clothes Dryers, 89 Fed. Reg. 18,164 (Mar. 12, 2024)......................19

Energy Conservation Program: Energy Conservation Standards for
    Consumer Furnaces, 88 Fed. Reg. 87,502 (Dec. 18, 2023)......................... 4, 5, 7

Energy Conservation Program: Energy Conservation Standards for
    Residential Clothes Dryers and Room Air Conditioners, 76 Fed Reg.
    22,454 (Apr. 21, 2011).............................................................................20

Energy Conservation Standards for Commercial Refrigeration Equipment,
    78 Fed. Reg. 55,890 (Sept. 11, 2013) .................................................................12

Energy Conservation Standards for Residential Furnaces and Commercial
    Water Heaters, 86 Fed. Reg. 4,776 (Jan. 15, 2021)...........................................19

**Rules:**

Fed. R. App. P. 29(a)(4)(E).....................................................................................1

**Other Authorities**

Brian F. Mannix & Susan E. Dudley, *The Limits of Rationality as a
    Rationale for Regulation*, 34 J. of Policy Analysis and Mgmt. 705 (2015).......17

**Other Authorities—Continued:** <u>**Page(s)**</u>

H.R. Rep. No. 100-11 (1987)...............................................................................4, 11

Jean-Cyril Walker et al., *DOE Continues High-Pace Rulemakings with New and Amended Test Procedures*, Nat'l L. Rev. (Oct. 28, 2022), https://perma.cc/5VSW-XLDV ...........................................................18

Off. of Mgmt. and Budget, *Agency Rule List–Fall 2023: Department of Energy*, https://perma.cc/ZJ9W-UW6S..........................................................18

Webster's New Collegiate Dictionary (1980) .........................................................10

# GLOSSARY

As used herein,

**Commercial Water Heater Rule** refers to Energy Conservation Program: Energy Conservation Standards for Commercial Water Heating Equipment, 88 Fed. Reg. 69,686 (Oct. 6, 2023)

**Consumer Furnace Rule** refers to Energy Conservation Program: Energy Conservation Standards for Consumer Furnaces, 88 Fed. Reg. 87,502 (Dec. 18, 2023)

**December 2021 Interpretive Rule** refers to Energy Conservation Program for Appliance Standards: Energy Conservation Standards for Residential Furnaces and Commercial Water Heaters, Notification of Final Interpretive Rule, 86 Fed. Reg. 73,947 (Dec. 29, 2021)

**DOE** or **Department** refers to the U.S. Department of Energy.

**EPCA** refers to the Energy Policy and Conservation Act

# STATUTES AND REGULATIONS

Relevant statutes and regulations are appended to Petitioners' brief.

# IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Many of the Chamber's members manufacture (or contribute to the manufacture of), sell, or use products subject to energy and water efficiency standards promulgated by the Department of Energy ("DOE" or the "Department") pursuant to the Energy Policy and Conservation Act ("EPCA"), as amended. The Chamber therefore has a strong interest in ensuring that DOE complies with EPCA, particularly the provisions in that statute that prohibit DOE from issuing energy-efficiency standards that would eliminate from U.S. markets existing products that consumers want, or that otherwise involve the agency picking product winners and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

losers at the expense of functionality and consumer choice. Proper interpretation of those statutory provisions, consistent with their ordinary meaning, is critical to avoiding regulatory upheaval and respecting the preservation of consumer choice enshrined in EPCA.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns the contours of DOE's standard-setting authority under EPCA, which provides the framework governing DOE's promulgation of new or amended energy (or water) efficiency standards for a vast range of consumer appliances on which U.S. consumers rely every day, including refrigerators, clothes washers and dryers, air conditioners, water heaters, furnaces, heat pumps, and dishwashers. 42 U.S.C. §§ 6292(a) (covered products), 6295 (standards). EPCA imposes similar requirements governing certain commercial and industrial equipment, such as commercial water heaters. *Id.* §§ 6311(1) (covered equipment), 6313 (standards). Such new and amended standards must be "technologically feasible and economically justified," the later criterion meaning that the benefits of the standard must exceed its burdens. *Id.* §§ 6295(o)(2)(A) & (B)(i), 6313(a)(6)(A)(ii)(II) & (B)(ii).

But in addition to imposing an overarching requirement of being technologically feasible and economically justified, EPCA contains a careful and express Congressional compromise between promoting energy efficiency, on the

2

one hand, and ensuring the continued availability of products and product characteristics that are important to consumers, on the other. *See Louisiana v. DOE*, 90 F.4th 461, 473 (5th Cir. 2024). To that end, EPCA directs DOE to consider, as part of its economic analysis, "any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard." 42 U.S.C. §§ 6295(o)(2)(B)(i)(IV), 6313(a)(6)(B)(ii)(IV). The statute also provides crucial flexibility by allowing DOE to subdivide a group of covered products and establish a separate standard (higher or lower) for a particular class of products, if products within that group have a "performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard." *Id.* § 6295(q)(1)(B). In determining whether a "performance-related feature" exists to justify a separate standard, DOE must consider "the utility to the consumer of such a feature." *Id.*

Perhaps most importantly for this case, EPCA contains an "unavailability" provision, in which Congress prohibited DOE from prescribing a new or amended efficiency standard if stakeholders "have established by a preponderance of the evidence that the standard is likely to result in the *unavailability* in the United States in any covered product type (or class) *of performance characteristics (including reliability), features, sizes, capacities, and volumes*." *Id.* § 6295(o)(4) (emphasis added); *see id.* § 6313(a)(6)(B)(iii)(II)(aa) (nearly identical). This provision is meant

3

to "ensure[ ] that energy savings are not achieved through the loss of significant consumer features," and prevent an outcome where "as a result of the standard, a product containing [a performance] characteristic would become prohibitively expensive." H.R. Rep. No. 100-11, at 22-23 (1987).

In the challenged rulemakings,[2] however, DOE runs roughshod over the careful balance Congress struck between energy efficiency and the continued availability of products that are favored by (or effectively necessary to) consumers and businesses, often due to those favored products' compatibility with existing living and business spaces. DOE advances an unduly cramped interpretation of the "performance characteristics" and "performance-related features" that EPCA was meant to protect. DOE's reading excludes a wide range of considerations that fall comfortably within the ordinary meaning of "performance characteristics," such as installation-related complexities that relate to size and operational functions, as well as costs associated with certain covered appliances. As a result, and by the agency's

---

[2] Energy Conservation Program for Appliance Standards: Energy Conservation Standards for Residential Furnaces and Commercial Water Heaters, Notification of Final Interpretive Rule, 86 Fed. Reg. 73,947 (Dec. 29, 2021) [hereinafter December 2021 Interpretive Rule]; Energy Conservation Program: Energy Conservation Standards for Commercial Water Heating Equipment, 88 Fed. Reg. 69,686 (Oct. 6, 2023) [hereinafter Commercial Water Heater Rule]; Energy Conservation Program: Energy Conservation Standards for Consumer Furnaces, 88 Fed. Reg. 87,502 (Dec. 18, 2023) [hereinafter Consumer Furnace Rule].

own admission,[3] DOE's rulemakings would render noncondensing natural gas furnaces and noncondensing natural gas commercial water heaters (i.e., those using vertical venting and natural draft to safely remove exhaust gas from a building) unavailable to millions of Americans whose homes and businesses cannot physically accommodate the DOE-preferred condensing furnaces and water heaters (i.e., those using horizontal venting and extra equipment to remove exhaust gas) without significant complication and, in many cases, costly renovation. Indeed, in some cases, the agency again concedes, consumers may be forced to switch to a different type of furnace or heater entirely, powered by electricity rather than natural gas. This interpretation of the statute, and its practical results, are contrary to EPCA's text, structure, and context.

Moreover, DOE's novel and unduly narrow interpretation of what constitutes a "performance characteristic" protected by EPCA's unavailability provisions will have negative implications far beyond markets for the specific residential and commercial furnaces and hot water heaters at issue in these rulemakings. The statutory language in question applies to a broad range of other covered products.

---

[3] *See* Commercial Water Heater Rule, 88 Fed. Reg. at 69,710 (explaining why the Department is "eliminating noncondensing" commercial water heaters); Consumer Furnace Rule, 88 Fed. Reg. at 87,589 (asserting that "non-condensing technology" is not a "performance-related 'feature'" under the statute, and so the Department has set efficiency standards that must be "achieved by use of condensing technology").

And DOE's own existing energy efficiency standards are replete with instances where the Department has previously (and properly) subdivided product classes based on characteristics that implicate space- and/or installation-related considerations, such as clothes dryers or refrigerators that can be installed in small living spaces, or that are compatible with different venting systems or voltages. The Department's past rulemakings have done so precisely to avoid depriving consumers of product features that provide consumers with tangible, practical value. DOE's flawed interpretation in the challenged rulemakings not only departs from the Department's prior approaches, but also invites efforts to eliminate a broad range of choice-protecting product classes—an outcome that would disrupt settled consumer and manufacturer expectations, increase regulatory uncertainty, and decrease consumer choice.

## **ARGUMENT**

### I. **Under EPCA, "performance characteristics" include space- and installation-related characteristics.**

EPCA's unavailability provision prohibits the Department from promulgating a new or amended efficiency standard that "is likely to result in the unavailability in the United States in any product type (or class) of performance characteristics (including reliability features, sizes, capacities, and volumes) that are substantially the same as those generally available in the United States at the time of the finding of the Secretary." 42 U.S.C. § 6313(a)(6)(B)(iii)(II)(aa); *accord id.* § 6295(o)(4)

(nearly identical). Consistent with that unambiguous limitation on agency authority, EPCA authorizes DOE to subdivide a class of covered products and promulgate separate standards, if certain products within a group have a "performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard." *Id.* § 6295(q)(1)(B).

In the December 2021 Interpretive Rule, which undergirds the Commercial Water Heater Rule and Consumer Furnace Rule,[4] DOE advanced a novel and troubling interpretation of EPCA. Under that reading, protected "performance characteristics" are narrowly limited to "feature[s] provide[d] to the consumer while interacting with the product," to the exclusion of "design parameters impacting installation complexity, or costs." December 2021 Interpretive Rule, 86 Fed. Reg. at 73,951. As applied to noncondensing appliances, DOE concluded: "[D]ifferences in cost or complexity of installation between different methods of venting (e.g., a condensing furnace versus a noncondensing furnace) do not make any method of venting a performance-related feature under 42 U.S.C. 6295(o)(4), as would justify separating the products/equipment into different product/equipment classes under 42 U.S.C. 6295(q)(1)." *Id.* DOE went on to explain that, in its view, "non-condensing technology (and the associated venting) does not provide unique utility to consumers

---

[4] *See* Commercial Water Heater Rule, 88 Fed. Reg. at 69,695, 69,704; Consumer Furnace Rule, 88 Fed. Reg. at 87,512, 87,536.

distinct from an appliance's function of providing heated air or water," and that a "consumer realizes the same perceived benefit (i.e., heated air or water) regardless of the [heat exchanger] technology used by the appliance." *Id.* at 73,955.

DOE has acted contrary to the statutory text in reading EPCA to mean that a wide range of consumer-relevant characteristics—including physical size, installation-related complexities and costs, and other practical limitations on a consumer's ability to use noncondensing appliances—do not constitute "performance characteristics" or "performance-related features" or provide consumer utility. Rather, EPCA's text, structure, and context compel the conclusion that a product's capability to work in one's home, office, or factory without requiring significant structural or aesthetic renovation is a "performance characteristic" or "performance-related feature." *Compare Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

*First*, space- and installation-related considerations (like those associated with noncondensing appliances) are plainly "performance characteristics" protected under EPCA from being rendered "unavailable." EPCA provides a non-exhaustive ("including") list of types of performance characteristics—"reliability, features, sizes, capacities, and volumes." 42 U.S.C. § 6313(a)(6)(B)(iii)(II)(aa); *accord id.*

§ 6295(o)(4). This is a broadly written list that evinces an effort for over-inclusiveness, rather than under-inclusiveness, as to the kinds of consumer-favored characteristics a covered product may have. *Compare Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Moreover, inclusion of terms such as "sizes, capacities, and volumes" indicate that DOE should consider a product's physical and functional characteristics, including space- and installation-related constraints (e.g., where and how an appliance fits within a living space, or the amount of space it occupies). Importantly, the inclusion of "capacities" alongside "volumes" and "sizes" indicates that the latter-most term has a meaning beyond a covered product's output or how much it can contain (e.g., how many clothes can fit inside a particular clothes washer, how much cooled air a particular air conditioner can supply). The term "size" (and, to some extent, "volume") sweep within the ambit of protected characteristics considerations of how a particular product fits within a particular living space, office, or factory. *See Emory v. United Air Lines, Inc.*, 720 F.3d 915, 926 (D.C. Cir. 2013) (favoring an interpretation that avoids "needless surplusage"); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1373 (D.C. Cir. 2007) (similar).

The plain meaning of the term "performance characteristics" leads to a similar conclusion as to the breadth of the unavailability provision.[5] A "characteristic" is commonly understood to mean "a distinguishing trait, quality, or property." *Characteristic*, Webster's New Collegiate Dictionary (1980). As relevant here, "performance" refers to "the ability to perform," or "the manner in which a mechanism performs." *Performance*, Webster's New Collegiate Dictionary (1980). Additionally, "feature" typically means "a prominent part or characteristic" or "something offered to the public or advertised as particularly attractive." *Feature,* Webster's New Collegiate Dictionary (1980). Taken together, a "performance characteristic," of which a "feature" is one type, is understood to mean a product's attributes or elements (or aspects or qualities) that make it work for consumers or make it otherwise attractive to them. The term is thus sufficiently broad to encompass, for example, noncondensing technology that fits into spaces designed for vertical venting systems and that (unlike condensing technology) can be installed without the need for costly building renovations—no doubt an attractive proposition for a large subset of consumers and businesses.

---

[5] The provisions of section 6295 related to "performance characteristics" and "performance-related features" were enacted as part of the National Appliance Energy Conservation Act of 1987. *See* Pub. L. No. 100-12, §§ 325(*l*)(4), (n)(1)(B), 101 Stat. 103, 115, 116. The Chamber accordingly provides contemporaneous authority as to the plain meaning of the relevant terms.

*Second*, the structure of EPCA itself supports a plain-meaning understanding of "performance characteristic" that encompasses space- and installation-related characteristics. *See Robinson*, 519 U.S. at 341; *Beecham*, 511 U.S. at 372 ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences."). For instance, EPCA not only prohibits efficiency standards "likely to result in the unavailability . . . of performance characteristics (including reliability, features, sizes, capacities, and volumes)," 42 U.S.C. § 6313(a)(6)(B)(iii)(II)(aa); *accord id.* § 6295(o)(4), but also provides authority to promulgate separate standards where a "performance-related feature" justifies doing so, *id.* § 6295(q)(1)(B). This authority includes promulgation of a standard higher *or lower* than what would otherwise apply. *Id.* § 6295(q)(1)(B). Thus, if a product offers a characteristic that "other products within such type (or class) do not have" and that consumers value, Congress contemplated that DOE would preserve that product (and its utility to consumers) through a separate standard, even if that separate standard is less stringent than for products with different characteristics. And Congress intended for DOE to exercise that authority liberally, as a means of placing consumer choice on par with efficiency. *See Louisiana*, 90 F.4th at 473 (observing EPCA's "balance[ ]" between efficiency and "the availability of desirable 'performance characteristics'"); *see also* H.R. Rep. No. 100-11, at 22-23.

Moreover, when Congress set initial efficiency standards for certain products, it subdivided certain covered product classes according to installation or design considerations. For instance, Congress separated mobile home gas-fired furnaces from other residential furnaces due to the different physical installation requirements for mobile homes. 42 U.S.C. § 6295(f)(1)-(2). Likewise, Congress separated "through-the-wall air conditioners" from other air conditioners to preserve performance characteristics, namely the "design[ ] to be installed totally or partially within a fixed-size opening in an exterior wall." *Id.* § 6295(d)(4)(A)(ii). And particularly relevant here, Congress separated remote condensing and self-contained condensing refrigerators, freezers, and automatic ice makers into separate product classes. *See id.* §§ 6313(c) (refrigerators and freezers), 6313(d)(1) (ice makers). "Remote condensing" appliances have a condenser physically separate from the unit, while "self-contained" appliances have a built-in condenser. That difference necessarily affects the size of the units as well as their ability to function in certain spaces, whether at all or without undue encroachment of living or usable spaces. *See* Energy Conservation Standards for Commercial Refrigeration Equipment, 78 Fed. Reg. 55,890, 55,905 (Sept. 11, 2013). Congress itself thus repeatedly established separate product classes for products that provide distinct functional utility to consumers because of their installation and space-related characteristics—even if the covered products serve the same overarching function (e.g., refrigeration, air

conditioning, provision of heat). Viewed in light of these express statutory choices, the Department's current reading is particularly implausible, insofar as it renders irrelevant, to application of the statutory unavailability provision, those same installation and space-related characteristics that Congress codified in express statutory subdivisions.[6]

    *Third*, DOE's position that the type of heat exchange technology (condensing or noncondensing) "does not provide unique utility to consumers distinct from an appliance's function of providing heated air or water," December 2021 Interpretive Rule, 86 Fed. Reg. at 73,955, is deeply flawed. The baseline from which DOE must make appropriate product distinctions is "any covered product type (or class)," 42 U.S.C. § 6295(o)(4), or "any group of covered products which have the same function or intended use," *id.* § 6295(q)(1). And DOE is directed to prescribe different standards if it finds that "covered products *within such group*" have certain distinguishing "performance-related features," with due consideration of "the utility to the consumer of such a feature." *Id.* § 6295(q)(1) (emphasis added). In other words, even if all products in a group have the same function or intended use when

_____

[6] Congress's expressly codified subdivisions bear on the proper interpretation of the Department's authority to prescribe standards for covered products within a particular group, in the context of a statute where Congress established certain initial standards, while also authorizing the agency to amend those standards, issue new ones, expand the range of covered products, and revisit existing standards. *See generally* 42 U.S.C. § 6295(a)(2), (*l*)(1), (m), (o).

described at a high level of generality (e.g., "providing heated air or water"), DOE must prescribe separate standards for products within the group if there are useful features justifying different standards.

By taking the contrary position, DOE would effectively nullify EPCA's standard-differentiation requirement. Under DOE's logic, no covered product type could ever be subject to varying efficiency standards—all furnaces provide the function of heating space, all water heaters provide the function of heating water, all dishwashers provide the function of washing dishes, all clothes dryers provide the function of drying clothes, and so on. Such a reading of EPCA "would subvert the statutory plan and contravene the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 291 (2011) (internal quotation marks and citation omitted). DOE's reading cannot be right, especially in light of EPCA's focus on promoting and protecting consumer choice.

*Fourth*, and finally, DOE's outsized emphasis on direct consumer interaction with an appliance, to the apparent exclusion of "design parameters impacting installation complexity," December 2021 Interpretive Rule, 86 Fed. Reg. at 73,951, is far too narrow an interpretation of EPCA's provisions. Many products covered under EPCA are of the type where direct consumer interaction is minimal. This is most evident for pieces of HVAC equipment (e.g., air conditioners, heat pumps,

furnaces, boilers), but also consumer products such as pool heaters and commercial and industrial products like pumps and electric motors. For such equipment, at least when operating correctly, the consumer is often not actively aware of the product's existence, other than when he or she turns it on or off, which may even occur automatically. But that does not mean that a consumer would not derive utility from characteristics beyond direct interaction, such as installation. This is likely why DOE has promulgated separate product classes for pieces of HVAC equipment based on space- and installation-related considerations. *See* 10 C.F.R. § 430.32(c) (standards for "space-constrained" air conditioners and heat pumps, "small-duct, high-velocity" systems, and "split" and "single package" units).

Similarly, even assuming arguendo that some consumers do not notice on an ongoing basis an appliance's "specific heat exchanger technology (noncondensing or condensing) or the associated venting," December 2021 Interpretive Rule, 86 Fed. Reg. at 73,951, this does not mean they derive no utility from the space- and installation-related attributes from the choice of such technology. Put differently, lay consumers may not understand the technical issues associated with a move from noncondensing to condensing technology, but they would undoubtedly find disruptive a permanent physical impact on their ability to enjoy their residences, such as hundreds or even thousands of dollars in increased installation costs, or the practical and functional harms from an unwanted structural modification (e.g.,

breaking through exterior walls or basement concrete slabs to install drainage pipes and sump pumps, and/or interior space loss) in order to accommodate a condensing system. A lay consumer would also naturally suffer tangible adverse economic, practical, and aesthetic consequences of being forced to accept a condensing vent terminal on the side of his or her house, such as noise and/or an exhaust plume that damages the building exterior, harms plants, limits use of adjacent external space, or simply obstructs the view.

## II. If upheld here, DOE's cramped interpretation of "performance characteristics" will have broad negative ramifications going forward.

While the case at hand most directly concerns energy efficiency standards for certain condensing and noncondensing furnaces, hot water heaters, and similar appliances, the underlying legal issues extend far beyond the confines of the case. EPCA's statutory provisions on unavailability and performance characteristics circumscribe DOE's authority with respect to *all* "covered products" under that statute, a range that extends far beyond consumer furnaces and commercial water heaters to include, as examples, air conditioners, heat pumps, dishwashers, clothes dryers, heating equipment, televisions, kitchen ranges, and showerheads. *See* 42 U.S.C. §§ 6295(o)(4), 6313(a)(6)(B)(iii)(II)(aa); *see also id.* §§ 6291(2), 6292(a) (defining "covered products" to include 19 enumerated categories plus "[a]ny other type of consumer products which the [Department] classifies as a covered product"). DOE's strained interpretation of "performance characteristic" to exclude space- and

installation-related features, if left uncorrected, could have broader negative ramifications for a variety of appliances and consumer products, beyond condensing and noncondensing appliances. Worse, it invites efforts by the Department and others to reopen prior rules that properly took account of those features to protect consumer choice while still advancing energy-efficiency goals. This Court should nip the Department's flawed legal interpretation in the bud before it spreads to other contexts.

At the outset, it is important to note that the number of energy efficiency standards promulgated by DOE has increased rapidly since Congress substantially amended EPCA in 2007.[7] In the nearly two-decade period between 1987 and 2006, DOE issued a sum total of seven such standards; between 2007 and 2014, by contrast, DOE issued twenty-five standards (or about three standards per year). *See* Brian F. Mannix & Susan E. Dudley, *The Limits of Rationality as a Rationale for Regulation*, 34(3) J. of Policy Analysis and Mgmt. 705, 706 (2015) (numbers from Figure 1). That pace has not slowed down. To the contrary, in the Fall 2023 Unified Agenda, published by the Office of Management and Budget and which lists ongoing and upcoming regulations planned by agencies for the year ahead, DOE

---

[7] *See* Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.

lists three standards in the "prerule stage" and sixteen in the "proposed rule stage."[8] *See* Off. of Mgmt. and Budget, *Agency Rule List–Fall 2023: Department of Energy*, https://perma.cc/ZJ9W-UW6S (last visited Apr. 15, 2024); *see also* Jean-Cyril Walker et al., *DOE Continues High-Pace Rulemakings with New and Amended Test Procedures*, Nat'l L. Rev. (Oct. 28, 2022), https://perma.cc/5VSW-XLDV (noting "over 40 [DOE] regulatory actions governing the consumer products category in the [ ] seven months" prior to October 2022). Amid such a fluctuating regulatory space, regulatory clarity and consistency are particularly critical, especially for manufacturers and users of the appliances and other products regulated by the various efficiency standards.

The statutory interpretation advanced by the Department in these rulemakings has potentially sweeping implications for ongoing rulemakings as well as the "installed base" of existing regulatory classifications on which millions of Americans (and manufacturers) rely. Looking just at existing standards, DOE has frequently treated space- and installation-related attributes as "performance characteristics" that should continue to be available to consumers and businesses, and/or relatedly as "performance-related features" warranting separate standards.

---

[8] These counts do not include test procedures for energy efficiency which, while integral to the promulgation of energy efficiency rules, do not in themselves establish energy conservation standards.

*See* Energy Conservation Standards for Residential Furnaces and Commercial Water Heaters, 86 Fed. Reg. 4,776, 4,782 (Jan. 15, 2021) (observing same). For instance, DOE has recognized seven different product classes for electric residential clothes dryers: (1) electric, standard capacity (4.4 cubic feet or greater); (2) electric, compact capacity (less than 4.4 cubic feet), operating at 120 volts; (3) vented electric, compact capacity, operating at 240 volts; (4) vented gas, standard capacity; (5) vented gas, compact capacity; (6) ventless electric, compact capacity, operating at 240 volts; and (7) ventless electric, combination washer-dryer. *See* Energy Conservation Program: Energy Conservation Standards for Consumer Clothes Dryers, 89 Fed. Reg. 18,164, 18,166 (Mar. 12, 2024) (direct final rule); *see also* 10 C.F.R. § 430.32(h)(3) (six similar categories prior to new direct final rule).

Amidst those classifications, DOE has recognized a "standard"/"compact" differentiation to account for constrained installation spaces, a 120-volt/240-volt differentiation to account for differences in a building system's existing electrical supply, and a vented/ventless differentiation to account for installation constraints based on available venting options. Those space- and installation-related characteristics (product size, compatible electrical supply, venting method) clearly provide "unique utility" distinct from the appliance category's general function of drying clothes—at least based on DOE's interpretation of EPCA at the time it promulgated those standards. *See* Energy Conservation Program: Energy

Conservation Standards for Residential Clothes Dryers and Room Air Conditioners, 76 Fed Reg. 22,454, 22,485 (Apr. 21, 2011) (noting the "unique utility that ventless clothes dryers offer to consumers"); *id.* at 22,485 ("DOE also notes that compact-size clothes dryers provide utility to consumers by allowing for installation in space-constrained environments."). And this despite such characteristics having much more to do with "design parameters impacting installation complexity, or costs," as opposed to direct consumer "interacti[on] with the product." December 2021 Interpretive Rule, 86 Fed. Reg. at 73,951. The Department's current position may naturally be understood as inviting reconsideration of these sensible and longstanding distinctions.

As another example, DOE has created product classes for residential direct heating equipment based on variations in their manner of installation, including gas wall furnaces that use either fans or gravity (i.e., rising heat) to direct heat through ductwork, gas floor furnaces, and gas room furnaces (i.e., room heaters). *See* 10 C.F.R. § 430.32(i). These product-class distinctions address variations in building characteristics affecting the relative ease or feasibility of different types of product installations (i.e., wall, floor, or room installations) as well as the availability of electrical supply (fan-driven wall furnaces require electrical power, whereas gravity wall furnaces may not). As above, DOE clearly recognized the utility of space- and installation-related characteristics in setting these energy efficiency standards and

protecting the availability of particular product classes, even though the product class achieves the same function (i.e., providing heat) and the characteristics have little to do with direct consumer interaction.

As yet another example, DOE recognizes separate product classes for residential heat pumps and air conditioners: split systems, single-package (unitary systems); small-duct, high-velocity systems; and space-constrained systems. *See id.* § 430.32(c). Again, all of these separate product classes exist to address installation constraints imposed by variations in the installation environment, including differences in wall area, building volume available for duct work, and available space in the structure for the installation of indoor units.

The above-described examples are just a few where DOE has taken into account space and installation-related considerations, or other factors not strictly tied to the Department's newfound "direct user interaction" test. Other examples abound. For instance, the Department has promulgated different standards for upright versus horizontal (i.e., "chest") refrigerators and refrigerator-freezers, including those in standard or "compact" form. *Id.* § 430.32(a). And it has issued separate standards for "tabletop water heaters," which account for the "strict size limitations" in some rooms and "are designed to slide into a kitchen countertop space and provide additional countertop surface area." Energy Conservation Program for Consumer Products: Energy Conservation Standards for Water Heaters, 66 Fed. Reg. 4,474,

4,478 (Jan 17, 2001); *see* 10 C.F.R. § 430.32(d). So too with separate classifications for high-speed and small-diameter, highly decorative, and belt-driven ceiling fans, distinctions which again preserve consumer options. *See* Energy Conservation Program for Consumer Products: Energy Conservation Standards for Ceiling Fans, 82 Fed. Reg. 6,826 (Jan. 19, 2017); *see also* 10 C.F.R. § 430.32(s)(2)(iii); *id.* Part 430, App. U.

These examples help demonstrate that while the challenged rulemakings here concern noncondensing and condensing appliances, the implications of the legal interpretation undergirding DOE's position in the challenged rulemakings could sweep far beyond those particular confines. DOE's novel (and apparently categorical) rejection of the idea that "design parameters impacting installation complexity, or costs" can provide consumer utility, and its puzzling conclusion that a characteristic lacks independent utility if a user of an appliance "realizes the same perceived benefit . . . regardless of the technology used by the appliance," December 2021 Interpretive Rule, 86 Fed. Reg. at 73,951, 73,955, may invite reconsideration of many of the above-described product categories and standards—just as the rules here threaten the continued availability in U.S. markets of appliances using noncondensing technology. The Department's current position violates EPCA's plain language and core principles, namely that preservation of consumer choice

(i.e., ensuring the continued availability of consumer-favored product features) is a consideration on par with, and not subservient to, advancing energy-efficiency goals.

This Court should reject the Department's atextual and novel re-interpretation of EPCA as contrary to the statutory text and Congress's expressed intent. Doing so will not only help restore the careful balance that Congress struck between efficiency and consumer choice, but will also avoid increasing uncertainty as to what constitutes a "performance characteristic" or "performance-related feature." Correcting the Department's error in this case would avoid inviting the agency or others to seek to revisit existing product classifications, and would help solidify principles of regulatory certainty and predictability upon which U.S. consumers, manufacturers, and businesses rely.

## CONCLUSION

This Court should grant the petitions for review.

Date: April 16, 2024                    Respectfully submitted,

                                        */s/ Jeremy C. Marwell*

Andrew R. Varcoe                        Jeremy C. Marwell
Stephanie A. Maloney                    Nathan Campbell
U.S. Chamber Litigation Center          VINSON & ELKINS LLP
1615 H Street, NW                       2200 Pennsylvania Avenue, NW
Washington, DC 20062                    Suite 500 West
                                        Washington, DC 20037
                                        Phone: 202.639.6507
                                        Email: jmarwell@velaw.com
                                        Email:  ncampbell@velaw.com


*Counsel for* Amicus Curiae
*the Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,015 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


Date: April 16, 2024

Respectfully submitted,
*/s/ Jeremy C. Marwell*

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on April 16, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Date: April 16, 2024

Respectfully submitted,
*/s/ Jeremy C. Marwell*

Jeremy C. Marwell
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6507
Email: jmarwell@velaw.com

*Counsel for* Amicus Curiae