No. 22-1030

Consolidated with Nos. 23-1285, 23-1337

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

AMERICAN GAS ASSOCIATION, et al.

*Petitioners,*

v.

U.S. DEPARMENT OF ENERGY, et al.

*Respondents.*

_____

On Petition for Review of a Rule of the
U.S. Department of Energy

_____

## ADDENDUM OF RESPONDENT-INTERVENORS

_____

LETITIA JAMES
Attorney General
JEFFREY W. LANG
Deputy Solicitor General
BRIAN LUSIGNAN
Assistant Solicitor General
TIMOTHY HOFFMAN
CHRISTOPHER GORE
Assistant Attorneys General

  Albany, NY 12224
  (518) 776-2422
  timothy.hoffman@ag.ny.gov

*Counsel for State of New York*

KEVIN BREINER
TIMOTHY BALLO
  Earthjustice
  1001 G Street NW, Suite 1000
  Washington, DC 20001
  (202) 667-4500
  kbreiner@earthjustice.org
  tballo@earthjustice.org

*Counsel for Sierra Club, Consumer Federation
of America, and Massachusetts Union of Public
Housing Tenants*

*(additional counsel listed in signature block)*

## TABLE OF CONTENTS

42 U.S.C. § 6295 ...............................................................................ADD-001

42 U.S.C. § 6313 ...............................................................................ADD-005

H.R. 5465, 99th Cong. §325(f) (1986) .................................................ADD-010

House Hearing – American Gas Association Testimony ...................................ADD-013

Senate Hearing - American Council for an Energy-Efficient Economy Testimony ...............................................................................................ADD-026

A Bill to Amend the Energy Policy and Conservation Act with Respect to Energy Conservation Standards for Appliances: Hearing Before the Senate Subcommittee on Energy Regulation and Conservation, 99 Cong. 455-468 (1986).......................ADD-031

H. Rep. 100-11 at 22-23 (1987) .........................................................ADD-045

Respectfully submitted,

*/s/ Kevin Breiner*
Kevin Breiner
Timothy D. Ballo
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
kbreiner@earthjustice.org
tballo@earthjustice.org
*Counsel for Sierra Club,*
*Consumer Federation of America, and*
*Massachusetts Union of Public Housing*
*Tenants*

Muriel Goode-Trufant
Acting Corporation Counsel

Christopher Gene King
Senior Counsel
Environmental Law Division
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2074
cking@law.nyc.gov

*Counsel for City of New York*

Brian L. Schwab
Attorney General

Caroline S. Van Zile
Deputy Solicitor General

Emily Davis
Joseph Vukovich
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6256
llynch@nrdc.org
jvukovich@nrdc.org
*Counsel for Natural Resources*
*Defense Council*

Andrea Joy Campbell
Attorney General

Turner Smith
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2782
turner.smith@mass.gov

*Counsel for Commonwealth of Massachusetts*

Kwame Raoul
Attorney General

Elizabeth Dubats
Office of the Attorney General,
State of Illinois
69 West Washington Street, Suite 1800
Chicago, IL 60602
(773) 590-6794

3

Office of the Attorney General for
the District of Columbia
Office of the Solicitor General
400 6th Street, NW, Suite 8100
Washington, DC 20001
(202) 727-3400
caroline.vanzile@dc.gov

*Counsel for District of Columbia*

Aaron Frey
Attorney General

Robert L. Martin
Office of the Attorney General
State of Maine
6 State House Station
Augusta, ME 04333-0006
(207) 626-8579
robert.martin@maine.gov

*Counsel for State of Maine*

Keith Ellison
Attorney General

Peter Surdo
Special Assistant Attorney General
Office of the Attorney General
State of Minnesota
445 Minnesota Street, Suite 1800
St. Paul, MN 55101-2127
(651) 757-1061
peter.surdo@ag.state.mn.us

*Counsel for State of Minnesota*

Matthew J. Platkin

*Counsel for State of Illinois*

Anthony G. Brown
Attorney General

John B. Howard, Jr.
Special Assistant Attorney General
Cadwalader, Wickersham & Taft LLP
1919 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 862-2200
j.b.howard@cwt.com

Steven Jay Goldstein
Office of the Attorney General
State of Maryland
200 St. Paul Place
Baltimore, MD 21202-2021
(410) 576-6300
sgoldstein@oag.state.md.us

*Counsel for State of Maryland*

Aaron D. Ford
Attorney General

Heidi Parry Stern
Solicitor General
Office of the Attorney General
State of Nevada
555 East Washington Avenue, Suite 3900
Las Vegas, NV 89101
hstern@ag.nv.gov

*Counsel for State of Nevada*

Raúl Torrez
Attorney General

Attorney General

David Apy
Assistant Attorney General
Division of Law
R.J. Hughes Justice Complex
25 Market St., P.O. Box 112
Trenton, NJ 08625
(609) 376-2818
David.Apy@law.njoag.gov

*Counsel for State of New Jersey*

Letitia James
Attorney General

Morgan Anna Costello
Assistant Attorney General
Office of the Attorney General,
State of New York
The Capitol
New York State Department of Law
Albany, NY 12224-0341
(518) 776-2392
morgan.costello@ag.ny.gov

Laura Mirman-Heslin
New York State Office of the
Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6091
laura.mirman-heslin@ag.ny.gov

Christopher Gore
Office of the Attorney General of
New York
Environmental Protection Bureau

William Grantham
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmdoj.gov
*Counsel for State of New Mexico*
Ellen F. Rosenblum
Attorney General

Paul Garrahan
Attorney-in-Charge
Steve Novick
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.garrahan@doj.oregon.gov
steve.novick@doj.oregon.gov

*Counsel for State of Oregon*

Robert W. Ferguson
Attorney General

Stephen Scheele
Assistant Attorney General
Office of the Attorney General
State of Washington
P.O. Box 40109
Olympia, WA 98504
(360) 586-4900
steve.scheele@atg.wa.gov

*Counsel for State of Washington*

Charity Clark
Attorney General

5

Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
christopher.gore@ag.ny.gov

Timothy Hoffman
Assistant Attorney General
Brian Murray Lusignan
Assistant Solicitor General
Office of the Attorney General
State of New York
Environmental Protection Bureau
The Capitol
Albany, NY 12224-0341
(716) 853-8465
(518) 776-2399
Timothy.Hoffman@ag.ny.gov
Brian.Lusignan@ag.ny.gov

*Counsel for State of New York*

Hannah Yindra
Office of the Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609-1001
(770) 634-3670
hannah.yindra@vermont.gov

*Counsel for State of Vermont*

**42 U.S.C. § 6295**

**§ 6295. Energy conservation standards**

. . . .

**(f) Standards for furnaces and boilers**

**(1)** Furnaces (other than furnaces designed solely for installation in mobile homes) manufactured on or after January 1, 1992, shall have an annual fuel utilization efficiency of not less than 78 percent, except that—

**(A)** boilers (other than gas steam boilers) shall have an annual fuel utilization efficiency of not less than 80 percent and gas steam boilers shall have an annual fuel utilization efficiency of not less than 75 percent; and

**(B)** the Secretary shall prescribe a final rule not later than January 1, 1989, establishing an energy conservation standard—

**(i)** which is for furnaces (other than furnaces designed solely for installation in mobile homes) having an input of less than 45,000 Btu per hour and manufactured on or after January 1, 1992;

**(ii)** which provides that the annual fuel utilization efficiency of such furnaces shall be a specific percent which is not less than 71 percent and not more than 78 percent; and

**(iii)** which the Secretary determines is not likely to result in a significant shift from gas heating to electric resistance heating with respect to either residential construction or furnace replacement.

**(2)** Furnaces which are designed solely for installation in mobile homes and which are manufactured on or after September 1, 1990, shall have an annual fuel utilization efficiency of not less than 75 percent.

. . . .

**(o) Criteria for prescribing new or amended standards**

**(1)** The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case

ADD-001

of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

**(2) (A)** Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

**(B) (i)** In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

**(I)** the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

**(II)** the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

**(III)** the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

**(IV)** any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

**(V)** the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

**(VI)** the need for national energy and water conservation; and

**(VII)** other factors the Secretary considers relevant.

**(ii)** For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

**(iii)** If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

**(3)** The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

**(A)** for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

**(B)** the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

**(4)** The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have

ADD-003

established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

**(5)** The Secretary may set more than 1 energy conservation standard for products that serve more than 1 major function by setting 1 energy conservation standard for each major function.

. . . .

**(q) Special rule for certain types or classes of products**

**(1)** A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

**(A)** consume a different kind of energy from that consumed by other covered products within such type (or class); or

**(B)** have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

**(2)** Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

**42 U.S.C. § 6313**

**§ 6313. Standards.**

**(a) Small, large, and very large commercial package air conditioning and heating equipment, packaged terminal air conditioners and heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks**

. . . .

**(6) Amended energy efficiency standards.—**

**(A)** In general.—

    **(i)**    Analysis of potential energy savings.—

If ASHRAE/IES Standard 90.1 is amended with respect to the standard levels or design requirements applicable under that standard to any small commercial package air conditioning and heating equipment, large commercial package air conditioning and heating equipment, very large commercial package air conditioning and heating equipment, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, or unfired hot water storage tanks, not later than 180 days after the amendment of the standard, the Secretary shall publish in the Federal Register for public comment an analysis of the energy savings potential of amended energy efficiency standards.

**(ii)** Amended uniform national standard for products.—

    **(I)**    In general.—

Except as provided in subclause (II), not later than 18 months after the date of publication of the amendment to the ASHRAE/IES Standard 90.1 for a product described in clause (i), the Secretary shall establish an amended uniform national standard for the product at the minimum level specified in the amended ASHRAE/IES Standard 90.1.

    **(II)**    More stringent standard.—

Subclause (I) shall not apply if the Secretary determines, by rule published in the Federal Register, and supported by clear and convincing evidence, that adoption of a uniform national standard more stringent than the

amended ASHRAE/IES Standard 90.1 for the product would result in significant additional conservation of energy and is technologically feasible and economically justified.

**(B)** Rule.—

**(i)** In general.—

If the Secretary makes a determination described in subparagraph (A)(ii)(II) for a product described in subparagraph (A)(i), not later than 30 months after the date of publication of the amendment to the ASHRAE/IES Standard 90.1 for the product, the Secretary shall issue the rule establishing the amended standard.

**(ii)** Factors.—In determining whether a standard is economically justified for the purposes of subparagraph (A)(ii)(II), the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed the burden of the proposed standard by, to the maximum extent practicable, considering—

**(I)** the economic impact of the standard on the manufacturers and on the consumers of the products subject to the standard;

**(II)** the savings in operating costs throughout the estimated average life of the product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the products that are likely to result from the imposition of the standard;

**(III)** the total projected quantity of energy savings likely to result directly from the imposition of the standard;

**(IV)** any lessening of the utility or the performance of the products likely to result from the imposition of the standard;

**(V)** the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

**(VI)** the need for national energy conservation; and

**(VII)** other factors the Secretary considers relevant.

ADD-006

**(iii)** Administration.—

**(I)** Energy use and efficiency.—

The Secretary may not prescribe any amended standard under this paragraph that increases the maximum allowable energy use, or decreases the minimum required energy efficiency, of a covered product.

**(II)** Unavailability.—

**(aa)** In general.—

The Secretary may not prescribe an amended standard under this subparagraph if the Secretary finds (and publishes the finding) that interested persons have established by a preponderance of the evidence that a standard is likely to result in the unavailability in the United States in any product type (or class) of performance characteristics (including reliability, features, sizes, capacities, and volumes) that are substantially the same as those generally available in the United States at the time of the finding of the Secretary.

**(bb)** Other types or classes.—

The failure of some types (or classes) to meet the criterion established under this subclause shall not affect the determination of the Secretary on whether to prescribe a standard for the other types or classes.

**(C)** Amendment of standard.—

**(i)** In general.—Every 6 years, the Secretary shall conduct an evaluation of each class of covered equipment and shall publish—

**(I)** a notice of the determination of the Secretary that standards for the product do not need to be amended, based on the criteria established under subparagraph (A); or

**(II)** a notice of proposed rulemaking including new proposed standards based on the criteria and procedures established under subparagraph (B).

**(ii)** Notice.—If the Secretary publishes a notice under clause (i), the Secretary shall—

> **(I)** publish a notice stating that the analysis of the Department is publicly available; and

> **(II)** provide an opportunity for written comment.

**(iii)** Amendment of standard; new determination.—

> **(I)** Amendment of standard.—

> Not later than 2 years after a notice is issued under clause (i)(II), the Secretary shall publish a final rule amending the standard for the product.

> **(II)** New determination.—

> Not later than 3 years after a determination under clause (i)(I), the Secretary shall make a new determination and publication under subclause (I) or (II) of clause (i).

**(iv)** Application to products.—Notwithstanding subparagraph (D), an amendment prescribed under this subparagraph shall apply to products manufactured after a date that is the later of—

> **(I)** the date that is 3 years after publication of the final rule establishing a new standard; or

> **(II)** the date that is 6 years after the effective date of the current standard for a covered product.

**(v)** Consideration of prices and operating patterns.—

If the Secretary is considering revised standards for air-cooled 3-phase central air conditioners and central air conditioning heat pumps with less [1] 65,000 Btu per hour (cooling capacity), the Secretary shall use commercial energy prices and operating patterns in all analyses conducted by the Secretary.

**(vi)** For any covered equipment as to which more than 6 years has elapsed since the issuance of the most recent final rule establishing or amending a standard for the product as of December 18, 2012, the first notice required under clause (i) shall be published by December 31, 2013.

ADD-008

**(D)** A standard amended by the Secretary under this paragraph shall become effective for products manufactured—

> **(i)** with respect to small commercial package air conditioning and heating equipment, packaged terminal air conditioners, packaged terminal heat pumps, warm-air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks, on or after a date which is two years after the effective date of the applicable minimum energy efficiency requirement in the amended ASHRAE/IES standard referred to in subparagraph (A); and

> **(ii)** with respect to large commercial package air conditioning and heating equipment and very large commercial package air conditioning and heating equipment, on or after a date which is three years after the effective date of the applicable minimum energy efficiency requirement in the amended ASHRAE/IES standard referred to in subparagraph (A);

> except that an energy conservation standard amended by the Secretary pursuant to a rule under subparagraph (B) shall become effective for products manufactured on or after a date which is four years after the date such rule is published in the Federal Register.

22

1        "(i) no earlier than between five years and no

2     later than ten years after the effective date of the pre-

3     vious amendment; or

4        "(ii) if the previous final rule did not amend the

5     standard, five years after the earliest date by which the

6     previous amendment could have become effective;

7  except that in no case may any amended standard apply to

8  products manufactured within five years after publication of

9  the final rule establishing such standard.

10     "(f) STANDARDS FOR FURNACES.—(1) Furnaces (other

11  than furnaces designed solely for installation in mobile

12  homes) manufactured on or after January 1, 1992, shall have

13  an annual fuel utilization efficiency of not less than 78 per-

14  cent, except that gas steam boilers shall have an annual fuel

15  utilization efficiency of not less than 68 percent.

16     "(2) Furnaces which are designed solely for installation

17  in mobile homes and which are manufactured on or after Jan-

18  uary 1, 1990, shall have an annual fuel utilization efficiency

19  of not less than 75 percent.

20     "(3)(A) The Secretary shall publish a final rule no later

21  than January 1, 1992, to determine whether the standards

22  established by paragraph (2) for mobile home furnaces should

23  be amended. Such rule shall provide that any amendment

24  shall apply to products manufactured on or after January 1,

25  1995.

23

1    "(B) The Secretary shall publish a final rule no later

2    than January 1, 1997, to determine whether the standards

3    established by this subsection for furnaces (including mobile

4    home furnaces) should be amended. Such rule shall provide

5    that any amendment shall apply to products manufactured on

6    or after January 1, 2002.

7    "(C) After January 1, 1997, and before January 1,

8    2007, the Secretary shall publish a final rule to determine

9    whether standards in effect for such products should be

10   amended. Such rule shall contain such amendment, if any,

11   and provide that any amendment shall apply to products

12   manufactured on or after January 1, 2012.

13   "(D) After the publication of the final rule described in

14   subparagraph (C), the Secretary shall publish a final rule—

15        "(i) no earlier than five years and no later than

16        ten years after the date of publication of the previous

17        final rule; or

18        "(ii) if the previous final rule did not amend the

19        standards, five years after the date of publication of the

20        previous final rule.

21   The Secretary shall determine in such rule whether to amend

22   the standards in effect for such products.

23   "(E) Standards amended pursuant to subparagraph (D)

24   shall apply only to products manufactured beginning—

24

1       "(i) no earlier than five and no later than ten

2       years after the effective date of the previous amend-

3       ment; or

4       "(ii) if the previous final rule did not amend the

5       standard, five years after the earliest date by which the

6       previous amendment could have become effective;

7   except that in no case may any amended standard apply to

8   products manufactured within five years after publication of

9   the final rule.

10      "(g) STANDARDS FOR DISHWASHERS; CLOTHES

11  WASHERS; CLOTHES DRYERS.—(1) Dishwashers manufac-

12  tured on or after January 1, 1988, shall be equipped with an

13  option to dry without heat.

14      "(2) All rinse cycles of clothes washers shall include an

15  unheated water option, but may have a heated water rinse

16  option, for products manufactured on or after January 1,

17  1988.

18      "(3) Gas clothes dryers shall not be equipped with a

19  constant burning pilot for products manufactured on or after

20  January 1, 1988.

21      "(4)(A) The Secretary shall publish final rules no later

22  than January 1, 1990, to determine if the standards estab-

23  lished under this subsection for products described in para-

24  graphs (1), (2), and (3) should be amended. Such rules shall

146

STATEMENT OF

THE AMERICAN GAS ASSOCIATION

BEFORE THE

SUBCOMMITTEE ON ENERGY CONSERVATION AND POWER

COMMITTEE ON ENERGY AND COMMERCE

UNITED STATES HOUSE OF REPRESENTATIVES

ON THE

"NATIONAL APPLIANCE ENERGY CONSERVATION ACT OF 1986"

H.R. 5465

September 16, 1986

---------------------------------------------------------------

## Introduction

The American Gas Association (A.G.A.), appreciates this opportunity to present its views on H.R. 5465, the "National Appliance Energy Conservation Act of 1986".

A.G.A. is a national trade association whose 300 natural gas distribution and transmission companies serve over 85% of the nation's annual househeating customers.  The natural gas industry serves over 166 million consumers in all 50 states.

I.  A.G.A. Strongly Supports H.R. 5465 In Principle.

As you know, an impressive array of organizations is urging passage of H.R. 5465 for a number of valid reasons. While the member constituents of each of these groups are greatly varied, their expressed reasons for supporting this legislation are very similar.  In fact, in reviewing the

147

-2-

comments made by many of these groups at the August 14 press
conference announcing this legislation, there are three
recurring themes:

- H.R. 5465 will save enough electrical energy to
  prevent or forestall construction of new electric
  generating plants;

- H.R. 5465 will provide manufacturers with federal
  appliance efficiency standards to preempt a plethora
  of conflicting state standards, easing their burden
  of compliance considerably; and,

- H.R. 5465 will provide a uniform federal standard
  for appliance efficiency, offering consumers the
  dual benefits of more energy efficient appliances
  that may cost less than they would cost otherwise.

A.G.A. believes these goals are laudable and we
sincerely believe H.R. 5465 will meet these goals much more
effectively than under the current state-by-state regulatory
status quo.

A.G.A.'s interest in appliance efficiency springs from
our belief that efficient energy use is in the best
interests of our customers.  Our industry has been in the
forefront of technological innovations that have resulted in
the development and commercialization of high efficiency gas
appliances, such as the latest generation of high efficiency
gas furnaces.  These developments have been market-driven
and have not had state or federal legislative or regulatory
mandates as their prime impetus.  In fact, the marketplace
reflects an increasing demand for high efficiency gas
furnaces, and sales have increased dramatically to the point
where, in 1985, these units comprised nearly one-third of

148

-3-

the market.[1]  We understand that a substantial number of
these were sales to the secondary, or replacement, market.
We continue to believe that the marketplace provides the
best signals to spur energy efficient appliance designs.

Nevertheless, we are concerned that states may
increasingly usurp the proper role of the marketplace in
appliance efficiency, with the result being a myriad of
state standards governing appliance efficiency.
Consequently, the legislation's uniform national appliance
efficiency standards would serve the manufacturers' need for
consistency, while providing the operational advantage of
phasing-in these standards over time, thereby promoting
energy conservation.  For this reason, A.G.A. endorses H.R.
5465 in principle and, with the following exception for
certain small gas furnaces, we join with those
organizations that are calling for its enactment.

II.  The Gas Furnace Standard Should Be Amended For
     Consistency With The Overall Goals of H.R. 5465

As stated above, H.R. 5465 was widely heralded at the
sponsors' August 14 press conference as being a means of
preventing or postponing construction of new electric
powerplants.  As written, H.R. 5465 could achieve the
opposite result.  It will narrow the choices of heating
equipment now available for consumers in homes, condominium

_____

1/  Gas Appliance Manufacturers Association, GAMA News,
    Percentage of High Efficiency Furnaces Grows
    (Arlington, VA; March, 1986).

149

-4-

or apartments, particularly those that have minimal energy
requirements (50,000 Btu/hour input or less), most likely
driving builders of such homes to use electric resistance
heating instead of gas furnaces.  In effect, all central
heating equipment included in H.R. 5465 (gas furnaces and
electric heat pumps) will be shut out of the market by the
least energy-efficient option:  electric resistance
baseboard heating and electric furnaces (neither of which is
subject to a standard under the bill).  This will hinder the
legislation's goal of saving energy because, when one
considers energy losses that occur from the point of
extraction of the primary fuel through electric generation
and transmission to the site, electric resistance heating is
less than 33% efficient.  By comparison, a mid-efficiency
gas furnace is 71-80% efficient.[2]

The legislation achieves this unfortunate, and we
believe unintended, result through provisions that would ban
the conventional, atmospherically vented furnace by virtue
of the manner defined in the test procedure and the
prescribed AFUE level of no less than 78%.  Since the AFUE
for mid-efficiency furnaces runs from 71% to 80%, the bulk
of conventional non-induced draft gas furnaces would also
fall short of the legislation's gas furnace standard.

II. A.   The Gas Furnace Standard Will Increase The First
         Cost Of Furnaces That Comply With The Standard.

The proposed gas furnace standard would hurt consumers

2/  American Gas Association, Marketing Analysis:  The
    Efficiency of Obtaining, Delivering and Utilizing
    Energy, at 23 (Arlington, VA: July 30, 1980).

150

-5-

in both the primary (or new construction) and the secondary (or replacement) markets. We believe that the bill would increase the first cost (i.e., the initial capital cost) of gas furnaces dramatically, perhaps by as much as $250 (see attached TABLE 1) thereby encouraging home builders, contractors or landlords in certain circumstances to opt for a less expensive first cost heating option. In most cases, we believe, electric resistance heating, for which the legislation sets no standard, would be this choice. The ultimate consumer, the homeowner or renter, would be done a disservice, since, as we stated above, electric resistance heating is less than half as efficient on a resource basis and significantly more expensive to operate as compared to a mid-efficiency gas furnace.[3]

One concern is that, since, unfortunately, the builder's purchase decision in most cases is made on first cost comparisons and not on payback considerations, this bill pre-ordains an inefficient and costly fuel choice. The consumer may pay less initially for the heating equipment if the builder opts for the less costly electric resistance heat and passes the lower price on to the consumer. However, the consumer would pay much higher fuel bills over the life of the equipment, thereby losing in the long run.

---

3/  Id.

151

-6-

A.G.A. is proposing to amend H.R. 5465 to provide an
AFUE standard of 71% for small gas furnaces of up to 50,000
Btu/hour input.  Compared to the proposed standard of 78%
AFUE for all gas furnaces, our proposal offers the consumer
in small housing units an option that, in the long run, is
much more advantageous.  As the following table indicates,[4]
this is because the 78% AFUE furnaces saves so little energy
that the consumer would be forced to chose between equipment
that could have a payback of up to 17 years (in the West-
South-Central-States) or a less expensive heating option:
electric resistance heating.  With this kind of payback, the
choice is obvious.

_____

4/  The data in Tables 2 and 3 were derived from the
    American Gas Association's Gas Househeating Survey:
    1985 (Arlington, VA; August, 1986).

ADD-018

152

-7-

## TABLE 2

CONSUMER PAYBACK FOR DIFFERENT EFFICIENCY SMALL FURNACES

Example (West South Central Climate)*
50,000 Btu/hr Furnace

| 71% AFUE Furnace | 78% AFUE Furnace |
|---|---|
| 29 MMBtu consumed[1] | 26 MMBtu consumed |
| $ 4.95/MMBtu (December 31, 1985 actual for SW region) | $ 4.95/MMBtu |
| $143.55 Fuel Bill | $128.70 Fuel Bill |

• Capital cost differential between atmospheric 71% AFUE furnace and 78% AFUE induced draft furnace estimated $250.00 simple payback (zero cost of capital) is $250/$14.85 = 17 years. The actual payback would be longer given the increased maintenance associated with a higher efficiency unit.

Example (East North Central Climate)**
50,000 Btu/hr Furnace

| 71% AFUE Furnace | 78% AFUE Furnace |
|---|---|
| 53 MMBtu consumed[2] | 48 MMBtu consumed |
| $ 5.33/MMBtu (December 31, 1985 actual for East North Central region) | $ 5.33/MMBtu |
| $282.49 Fuel Bill | $255.84 Fuel Bill |

• Capital cost differential between atmospheric 71% AFUE furnace and 78% AFUE furnace estimated to be $250.00. Simple payback (zero cost of capital) is $250/26.65 = 9.4 years. The actual payback would be longer given the higher maintenance costs associated with the more expensive higher efficiency unit. [Note that with a 12% consumer loan interest rate, the fuel cost savings will not even cover the interest part of the financing charge].

1. Assumes an 1000 square foot home, about 30% smaller than average home in region and size home expected to be heated by smaller furnace.

2. Assumes an 800 square foot home -- the maximum size that could be effectively heated with a 50,000 Btu/hr furnace (normal insulation level assumed).

*    Arkansas, Louisiana, Oklahoma, Texas.
**   Illinois, Indiana, Michigan, Ohio, Wisconsin.

**153**

-8-

We believe that, unless the gas furnace standard is amended, consumers will be driven to electric resistance heating, which will increase the demand for electricity. Thus, the legislation's goal of energy conservation through energy efficient appliances would be thwarted and the bill's goal of deferring or avoiding new powerplant construction would be subverted. It would be disingenuous to deny that one of our concerns is that gas utilities would lose a substantial end use market to the electric utility. Nevertheless, these results contradict what some have stated about H.R. 5465, i.e., that everyone will win if it is enacted as written. On the contrary, consumers will lose, and so will gas utilities.

II. B.   The Replacement Market For Gas Furnaces Will Be
         Adversely Affected By The Gas Furnace Standard.

Another of our concerns pertains to the effect the bill's gas furnace standard will have on the secondary, or replacement, market. The customer will be faced with a narrower range of gas furnace options which, as the market exists today, are more expensive than conventional, atmospherically vented mid-efficiency furnaces. As we have stated above, the customer may choose a less costly heating option (an electric furnace) which would be less energy efficient and would be more expensive for the consumer to operate over the life of the product.

The impact of proscribing the least costly of small gas furnaces will be detrimental for low income consumers and for consumers purchasing small "starter homes". One of

ADD-020

154

-9-

A.G.A.'s member companies estimates that approximately 25%
of its customers have annual family incomes of less than
$15,000.  By mandating an AFUE of 78% or greater, this
legislation would force these families to pay approximately
$250.00 plus installation costs over the cost of a base
furnace for a gas furnace that meets the proposed standard.
Rather than replace the furnace, they may defer this
purchase and continue to use a worn out furnace that needs
to be replaced.  Alternatively, they may go without heat and
rely on electric space heaters to provide necessary warmth,
thereby using energy less efficiently and more expensively
with less overall comfort.  In any case, the goals of this
legislation would be subverted.

III.  A.G.A. Recommends Two Alternatives To Remedy Our
      Concerns With The Gas Furnace Standard.

III.  A.  Option A.

     In view of our concerns about the effect of this
legislation on gas furnaces, we believe that the gas furnace
standard should be amended to read as follows:

          "325(f)  STANDARDS FOR FURNACES. –
          (1)  Furnaces. . . shall have an
          annual fuel utilization efficiency
          of not less than 78 percent, . . .
          and except for furnaces that have
          an input of up to 50,000 Btu/hour,
          in which case such furnaces shall
          have an annual fuel utilization
          efficiency of not less than 71
          percent."

We believe this amendment is necessary if the legislation is
to achieve its energy efficiency goals in reality as well as
in principle.  The 50,000 Btu/hour input cap would apply to

155

-10-

smaller single family houses, townhouses and apartments, as well as homes in warmer climates which have lower energy needs.  Moreover, this amendment will cover only a small percentage of units and, thus, will enhance the legislation's energy conservation goals without reducing overall energy savings.  According to the latest data available to us compiled by the Gas Appliance Manufacturers Association, furnaces that meet this exception comprised 4% of the number of gas furnaces shipped during the first 9 months of 1983.[5]  By limiting our proposal to these smaller furnaces, we recognize explicitly the appropriateness of the standard for larger units.  However, in smaller houses or multifamily units, the standard as written simply will not be cost-effective.

A.G.A.'s proposed lower AFUE of 71% was selected to track the current California standard for gas furnaces.  Moreover, it is consistent with the standards set in Section 325(e)(3) for gas direct heating equipment, which is categorized by size and type of heating equipment and which ranges in efficiency standards from 56% to 74% AFUE for similarly sized equipment.

III. B.  Option B.

As an alternative to the above amendment, A.G.A. is willing to accept an amendment to the furnace standard that

_____

[5]/  Gas Appliance Manufacturers Association, <u>Statistical Release:  Gas Warm Air Furnaces by Efficiency Rating, January - September 1983</u> (Arlington, VA, 1983).

156

-11-

provides a blanket waiver from federal energy efficiency standards for any gas furnace that is up to 45,000 Btu/hour input. Although this amendment would cover smaller furnaces than under Option A discussed above, the fact that there would be no minimum AFUE specified federally would provide at least some low-cost gas heating equipment to consumers, builders and landlords in lieu of electric resistance heating. The payback figures are less impressive than under A.G.A.'s Option A, as can be seen from Table 3.

TABLE 3

CONSUMER PAYBACK FOR DIFFERENT EFFICIENCY SMALL FURNACES

Example (West South Central Climate)*
45,000 Btu/hr Furnace

| 65% AFUE Furnace | 78% AFUE Furnace |
|---|---|
| 32 MMBtu consumed[1] | 26 MMBtu consumed |
| $ 4.95/MMBtu (December 31, 1985 actual for WSC region) | $ 4.95/MMBtu |
| $158.40 Fuel Bill | $128.70 Fuel Bill |

- Capital cost differential between atmospheric 65% AFUE furnace and 78% AFUE induced draft furnace is estimated to be $250. Simple payback (zero cost of capital) is $250/$29.70 = 8.4 years. The actual payback would be longer given the higher maintenance costs associated with the more expensive, higher efficiency unit.

Example (East North Central Climate)**
45,000 Btu/hr Furnace

| 65% AFUE Furnace | 78% AFUE Furnace |
|---|---|
| 58 MMBtu consumed[2] | 48 MMBtu consumed |
| $ 5.33/MMBtu (December 31, 1985 actual for ENC region) | $ 5.33/MMBtu |
| $309.14 Fuel Bill | $255.84 Fuel Bill |

- Capital cost differential between atmospheric 65% AFUE furnace and 78% AFUE furnace estimated to be $250.

157

-12-

> Simple payback (zero cost of capital) is $250/53.30 = 4.7 years. The actual payback would be longer given the higher maintenance costs associated with the more expensive higher efficiency unit.**

Nevertheless, it would provide the consumer with a low-cost gas furnace option which H.R. 5465, as written, forecloses.

Finally, by adopting either of A.G.A.'s amendments you will satisfy the chief concern A.G.A. members have with this legislation. At a recent meeting of A.G.A. member company executives, a number of concerns surfaced in addition to the gas furnace standard and how it is affected by the lack of a standard for electric resistance heat. For example, the bill's proposed heat pump standard fails to address the heating side of the heat pump, focusing only on cooling cycle efficiencies. This can skew overall efficiency ratings, since it assumes that the heating cycle will be as efficient as the cooling cycle, which does not necessarily follow. We continue in our firm belief that the Department of Energy should address these omissions, as it would be empowered to do under Section 3 of the legislation. Nevertheless, in the interest of compromise and as a reflection of our overriding desire to see H.R. 5465

*FOOTNOTES FOR TABLE 3.

1. Assumes an 1000 square foot home, about 30% smaller than average home in region and size home expected to be heated by smaller furnace.

2. Assumes an 800 square foot home -- the maximum size that could be effectively heated with a 45,000 Btu/hr furnace (normal insulation level assumed).

*Arkansas, Louisiana, Oklahoma, Texas.
**Illinois, Indiana, Michigan, Ohio, Wisconsin.

158

-13-

enacted, we urge you to adopt only our limited amendment to the gas furnace standard.

CONCLUSION

For the foregoing reasons, we support immediate enactment of H.R. 5465, with an amendment to the gas furnace standard that would make this legislation consistent with the its stated goal of conserving energy through its efficient use.

COSTS FOR GAS FURNACE EFFICIENCY UPGRADES*

| | | | |
|---|---|---|---|
| BASE CASE: | Good Quality, Conventional Atmospherically Vented Gas Furnace (Standing Pilot, 65% AFUE) | | $435 |
| 1st | Eff. Upgrade - Electronic Ignition (No Standing Pilot, 71% AFUE) | Δ = | $475 $ 40 |
| 2nd | Eff. Upgrade - Electronic Ignition Plus Induced Draft (78 - 85% AFUE) | Δ= | $655 $220 |
| 3rd | Eff. Upgrade - Electronic Ignition Plus Power Burner/Forced or Inducer Draft Plus Secondary Heat Exchanger (85 - 90% AFUE) | $825 - 1055 Δ= $ 390 | |
| 4th | Eff. Upgrade - Fully Condensing (90 - 97% AFUE) | Δ= | $ 1335 $ 900 |

*(REF: Technical Support Document, Proposed Interim Energy Conservation Standards For New Federal Residential  Bldgs - U.S. DOE).

147

ENERGY AND ECONOMIC SAVINGS POTENTIAL FROM
NATIONAL APPLIANCE EFFICIENCY STANDARDS

Howard S. Geller
American Council for an Energy-Efficient Economy
August, 1986

This analysis examines the energy and economic savings that can be expected from the national minimum efficiency standards for appliances recently agreed to by appliance manufacturers and conservation advocates. These standards levels are specified in legislation introduced in the U.S. Congress [1]. The proposed standards levels are listed in Appendix A. The savings are calculated on a product-by-product basis using a consistent methodology, as explained below.

I. Methodology

A. General

The analysis covers the following products included in the national appliance standards bill: refrigerators (R/F), freezers (FR), room air conditioners (RAC), central air conditioners and heat pumps (CAC and HP), electric water heaters (EWH), gas water heaters (GWH), gas furnaces and boilers (GF), and gas ranges (GR). Direct heating equipment (space heaters), dishwashers, clothes washers, and swimming pool heaters are included in the bill but not in this analysis because savings for these products are difficult to estimate and are unlikely to be as large as for the other products.

The analysis considers the energy use, first cost, and operating cost of products sold between 1986 and 2000. National product sales

1

ADD-026

148

are projected year-by-year along with the anticipated energy use of typical models produced under a "marketplace scenario" (i.e., without national standards) and a "standards scenario". Improvements in efficiency in the marketplace scenario are based on estimates provided by industry associations where available. Specific assumptions are explained below for each type of product.

Product sales are projected by first taking the average number of shipments during 1981-1985. This value is considered the normalized shipment level for 1983. It is increased on an annual basis using the estimated rate of increase of the housing stock during 1983-2000, 1.33% per year [3]. The sales projections are included in the tables of results.

The analysis includes the energy and dollar savings over the lifetime of products affected by standards sold by the year 2000. The economic analysis is done in terms of constant 1985 dollars using a 5% real discount rate for equipment and energy costs in the future. The extra first cost for more energy-efficient models is estimated based on a constant cost increase per unit of energy savings. This value is derived from other studies as described below for each product. Average residential energy prices in 1985 -- $0.078/kWh for electricity and $6.06/MBtu for natural gas -- are used [2]. Also, it is assuming that prices remain level in constant dollars; i.e., prices do not rise faster (or slower) than inflation.

B. Refrigerators and Freezers

In the marketplace case, projections by AHAM of the average electricity consumption of new models produced in 1987, 1990, and 1996

2

ADD-027

153

rebate programs that encourage the purchase of highly efficient models. During 1993-2000, the same rate of efficiency increase as in the marketplace case (1.0%/yr) is assumed.

In this analysis, electricity savings resulting from the use of HPs for heating is not accounted for. This underestimates the savings potential from standards because there will be a reduction in electricity consumption for heating as well as cooling. However, the heating efficiency of HPs is not regulated, making it difficult to estimate savings on the heating side.

Regarding the extra first cost associated with increasing the efficiency of CACs and HPs, there is currently a first cost premium of about $320 per unit of SEER for systems of average capacity in the SEER range of 8.5 to 12.0 [13]. This high cost premium is expected to fall when less efficient equipment is eliminated from the marketplace and the market share for highly efficiency equipment expands. Once the CAC and HP standards becomes effective in 1992-93, a first cost premium of $160 per unit of SEER improvement is assumed for a typical CAC or HP.

Other key assumptions include a 12 year lifetime [6] and a 75% diversification factor when estimating peak load.

F. <u>Central</u> <u>Furnaces</u> <u>and</u> <u>Boilers</u>

Based on data collected by GAMA, it is estimated that the average AFUE rating of new furnaces reached about 0.74 in 1985, up 2.1%/yr on the average during 1978-85 [14]. In the marketplace scenario, it is assumed this rate of increase falls to 1.0%/yr during 1986-90 and 0.5%/yr during 1991-2000. These rates are consistent with stable gas

7

ADD-028

154

prices and are considered reasonable by GAMA [14].

The furnace and boiler standard, a minimum AFUE rating of 0.78 using the California isolated combustion test, implies that fuel-fired heating systems must be of the power burner or condensing flue gas design. Assuming that two-thirds of gas furnace and boiler shipments have a power burner and one third are condensing in 1992 (the year the standard becomes effective), the average AFUE that year would be about 0.86. This is 10% greater than the minimum level. The same rate of efficiency improvement is assumed during 1993-2000 in both the standards and marketplace cases.

Energy savings due to standards are estimated for gas furnaces and boilers only. Oil-fired equipment is not included because the average AFUE is already 0.78. Thus, a minimum efficiency standard at this level in 1992 will probably not have much impact.

Energy consumption for space heating is determined assuming an average space heating load of 45 MBtu throughout the 1986-2000 time period. This value is based on estimates indicating the national average heating load was 50 MBtu during the early 1980s [9,16], along with the assumption that the thermal integrity of housing gradually improves over time.

Estimating the extra first cost for increasing the efficiency of gas furnaces and boilers is problematic because there is a moderate increase in first cost for the addition of the power burner but a large incremental cost for condensing furnaces [12]. Assuming that two-thirds of shipments under standards feature the power burner and one third are condensing models, the average cost increase is $30.60 per

8

ADD-029

155

unit of AFUE improvement based on DOE's cost data updated to 1985 dollars [12]. This corresponds to $43 per MBtu/yr of savings at the assumed heating load.

A 23 year lifetime is also assumed for the gas furnace and boiler analysis.

G. Gas Ranges

The proposed standards include a ban on pilot lights in gas ranges with an electrical connection. About 95% of all ranges produced have an electrical connection [14]. In recent years, 38-41% of all gas ranges produced included pilot lights [14]. This percentage has been falling slowly over time.

Once the pilot light ban becomes effective beginning in 1990, it is assumed that pilot lights are removed from 30% of all shipments. Furthermore, it is assumed that the removal of pilot lights lowers the gas consumption of a typical range from 8.7 MBtu/yr to 4.8 MBtu/yr [6].

The extra first cost for the replacement of pilot lights with electric ignition is based on the retail prices of otherwise identical models listed in the 1985 Sears catalog. This price difference is $40. Thus, pilot light removal reduces gas use at a cost of $10 per MBtu/yr of savings.

II. Results

A. Energy Savings

Tables 1-8 contain the energy savings results on a product-by-product basis. The tables include aggregate annual savings from the products sold in any particular year along with the cumulative annual

9

455

Senator EVANS. Thank you very much.

Well, I think we have before us the people to reach some kind of conclusions, I hope, on whether we can get this legislation or not.

Mr. Honea, what is your estimate of the percentage of residences now that could well be served by the 50,000-Btu-or-less furnace?

Mr. HONEA. Today, we estimate the market at 4 to 5 percent of the total market.

Senator EVANS. What about the testimony, Mr. Morron, that as we look ahead to new homes, which are much better insulated, where energy requirements are seriously reduced and with the movement toward smaller homes, what do you anticipate that market will be?

Mr. MORRON. I would agree with the assessment that the trend is in that direction but would conclude slightly differently that you therefore have more and more of the homes where we may be chasing the homeowner into a less efficient heating source, which is either the all-electric—electric resisting heating unit or the combination of a heat pump backed up by electric resistancy.

Senator EVANS. Mr. Morron, why shouldn't this legislation be amended to set standards for electric resistance heating and for the heating cycle on heat pumps?

Mr. MORRON. Mr. Chairman, if the intent of such an amendment were to be resolved in the very disagreement that has been raised before you today, I don't think we would have much difficulty with doing that. In fact, as late as last evening, at about 9:30, we were in conversation with members of the original consortium and others, suggesting that we would be willing to include in a rulemaking procedure from DOE heat pumps or space conditioning, actually, was the phrase that was being discussed. As long as the standard as proposed in the legislation was set and was in effect and that the DOE, in this instance, would determine whether a market segmentation was appropriate and, if so, what sort of a standard should be set, and in the event of a no-standard standard finding, that those standards contained in the legislation would then take precedence.

We don't see that that would give us great cause. We do not, however, wish to see with the disagreement you see before you today impede the progress of the other legislation.

Senator EVANS. You said in your testimony, at least in your oral testimony, that resistance heating essentially was 100 percent efficient in the translation of electric energy going in to what comes out. And that is quite different than the testimony I think of Mr. Honea or others. And, of course, the difference, which I understand quite well, is the efficiency of the plant that generates the electricity that comes in. And there is a considerable difference between, I would guess, electricity coming to a resistance coil that is created from hydroelectric energy as opposed to a combustion turbine.

Mr. MORRON. That is correct.

Senator EVANS. Should a legitimate standard—if what we are after is energy efficiency, if we are trying to reduce the amount of energy used, as relates to electric resistance heating, relate to the source of generation of that electricity rather than the resistance heating itself?

456

Mr. Morron. The use of the source energy argument has been reviewed at not only the Federal level but in a number of State commissions and, frankly, they find it very difficult to deal with, as do I. Certainly, if your choice of fuel is electricity and your choice to implement that fuel for heating purposes is resistance, you run up against some very basic laws of thermodynamics against which no one can operate—or revoke, rather.

So, that if we are concerned with energy efficiency, I submit, as I did in my oral testimony, that electric resistance heating is certainly not the only option these customers have—and they are choosing others today—we submit that we would be willing to have space conditioning equipment as a whole be considered in a rulemaking procedure. And that would be inclusive of electric resistance heating.

Senator Evans. But you don't think it is practical to try to relate that back to the efficiencies of energy production on the other end of the wire?

Mr. Morron. No, sir; Senator Evans, I do not. I have been aware of this argument now for nearly 10 years and I have been dealing with it both as a member of an operating company in the State of Arizona and our State commission as well as here in Washington, since I joined EEI.

And I might point out that both companies I worked for in Arizona were combination companies, both gas and electric. I still have great difficulty in accepting that source performance argument.

Senator Evans. You have great difficulty accepting it because it's difficult to figure out or for other reasons?

Mr. Morron. Senator Evans, I really think it is virtually impossible to arrive at a number. And the reason I say that is it all depends on what kind of energy components you wish to include in your assessment of the source energy performance.

For example, are we including in source energy performance the energy that is necessary to make the steel that makes the drill that makes the bit that makes the rig, et cetera, et cetera, in order to tap to the gas in the first place.

Are we considering the energy expended by the diesel motor or what have you that is driving the drilling rig. In short, there is any number of ways that that source performance standard can be skewed either up or down to make a case or to blow it away. And both the American Gas Association and EEI have had experience doing just that.

Senator Evans. I have listened to this argument before.

But it does seem to me that while that is true and you can trickle clear back to the first exploration, I would judge, at least from all the figures I have seen, by far the largest. And as you go down the line, certainly on the electrical side is the loss of efficiency from the generation of electricity and the line losses getting the electricity to the home.

Mr. Morron. They are undeniable, Senator, and I am not here to try and deny them.

Senator Evans. Mr. Honea, in your testimony you say it would cost $250 to get up to the efficiency, compared to the current small furnace, to get up to the efficiency that the bill would require, it would cost $250. But in the last page of your testimony where you

457

have a series of tables and the various upgradings, that second upgrading would cost $220.

Which is it, $250 or $220?

Mr. HONEA. Senator, that is a bit of a glitch. I use the 250 number as a rough estimate before the AGA staff helped me to prepare that last table. And either number, we are dealing with ballpark figures and averages for a wide variety of equipment.

But taking the 220, I think you can see very clearly the steps that we think would have to be taken there. First, is a step to get automatic or electronic ignition, which you would get if you went to our 71 percent standard, and that would get rid of the standing pilot, which seems like a good move.

And then the second and biggest steps is the one we would like to try to avoid for these small furnaces is the addition of the power vent.

Senator EVANS. What percentage of small furnaces now being produced do not have electronic ignition and still depend on a continuing pilot?

Mr. HONEA. I am going to say about 50 percent. But I would like to get you some exact numbers, if I might.

Senator EVANS. All right. You might submit those.

What is your estimate for the future? What is happening now in terms of stoves, for instance? Aren't almost all modern stoves electronic ignition?

Mr. HONEA. Yes; I would think so.

Senator EVANS. Why haven't we moved to that? Certainly, it doesn't appear at least to me that electronic ignition for stoves can be a terribly expensive proposition. Is it for furnaces?

Mr. HONEA. I am sorry. I don't know the answer to why we haven't moved faster on furnaces.

Could I call on some help?

Senator EVANS. Yes; please.

If you can identify yourself for the record.

Mr. CUCCINELLI. My name is Ken Cuccinelli. I am vice president, marketing, with the American Gas Association.

Senator, you are absolutely right. Virtually all ranges now have electric ignition. And the trend has been upward in gas heating equipment. Just to take an example, in the equipment that is over 80 percent efficient several years ago, like 3 or 4, it was virtually negligible and it is now about 30 percent of furnace shipments are in furnaces, over 80 percent.

The cost of putting electric ignition onto a furnace would be about $100 is our best guess. So, to get to that 71 percent——

Senator EVANS. On the table it says $40.

Mr. CUCCINELLI. That is manufactured. But to the retail, we have got two levels there. The manufacturers tell us $40. We have used about double that number for what it ends up to be.

Senator EVANS. Well, what are your prices here? As you have them in the last table, when you say a good quality conventional atmospherically vented gas furnace, standing pilot 65 percent AFUE, $435—is that retail or manufactured?

Mr. CUCCINELLI. That is retail.

Senator EVANS. That is retail.

458

So, when you put the deltas in here, are those retail or are those manufactured?

Mr. CUCCINELLI. Yes; we did. Because we are——

Senator EVANS. Yes; what?

Mr. CUCCINELLI. Yes; the deltas are retail.

Senator EVANS. OK. But then you put $40 in retail for the electronic ignition which, frankly, sounds a lot more like what's closer to reality. And I don't know a thing about it except that we have got a gas range now that we moved back here. And every one of the burners has its own electronic ignition.

Mr. CUCCINELLI. I was just handed the sheet. I was going from memory. And the $40 number is a retail number.

Senator EVANS. OK.

So, $40 will take you from 65 to 71. How long does it take to recover that $40 in fuel deficiency, the fact that you don't have a pilot burning all the time?

Mr. HONEA. Senator, that is a very good payoff and we are recommending that one in our amendment, that we stay with 71 percent even for the smaller furnaces.

Senator EVANS. OK. That gets you 71 percent.

What about the next—is the only next step. Now, that takes you—you say the 78 to 85 when you have induced draft. Are there any other steps that increase efficiency from the 71 percent, the step one that you had there, other than the next step of induced draft?

Mr. HONEA. Senator, I am not a manufacturer or engineer as you are. But I think that becomes the basic next step that has to be taken.

Senator EVANS. In other words, you have to have an induced draft before you can get to the secondary heat exchanger?

Mr. HONEA. Yes, sir; and you seem to need the induced draft and the type of heat exchange that goes with it in order to get that next jump in efficiency, in any case.

Senator EVANS. Induced draft is really nothing much more than putting a fan in there to make the draft more efficient?

Mr. HONEA. Adding a fan and motor.

Senator EVANS. So, it is a fan and a motor?

Mr. HONEA. And modifying the heat exchanger itself just for the way the heat is exchanged from the gas to——

Senator EVANS. It sounds awfully expensive. Sounds like an awfully expensive motor and fan.

Mr. HONEA. I think we have—again, this is retail—and you do have the markups.

Mr. CUCCINELLI. Plus control, safety control. There has to be switching gear—and the manufacturers can give you the information on this—but the switching gear to make sure that it is operating properly to shut off the gas, if there is any venting problem and such.

Senator EVANS. Isn't that also true of a range?

Mr. CUCCINELLI. The difference with a range is that it is a supervised combustion. A person turns it on and there is visual contact. And with the furnace, it is remote. There is a point, though, that I would like to emphasize in the data here and something that EEI indicated.

459

Our concern is in the starter home—new family starting home, low-income housing, the multifamily housing—we have members that have indicated that 25 percent of their households make $15,000 or less. And they are worried that if the first cost of the replacement market increased such that people would postpone their replacements, they are worried about safety issues in those cases.

Senator Evans. In earlier testimony in response to a question, however, there appears to be an increasing willingness of lending institutions to qualify buyers, especially buyers for these first homes, or a higher value home based on their income than would otherwise be the case, if that home is energy-efficient, because they legitimately understand that to run the home, you have to take into account both mortgage payments as well as the utility payments.

And if, in fact, there is a reasonable payoff, doesn't that qualify people for homes that otherwise couldn't think it?

Mr. Cuccinelli. Most of those lending institutions deal with the structure of the house, the insulation levels. They are talking about—most of what we have seen deal with the structure, and they don't go into a fuel choice.

Senator Evans. Oh, I think ones in Northwest are certainly taking a look at the various kinds of appliances and the whole ball of wax. I think that that's a legitimate and I think the growing way to look at things. In other words, it deals with the very fear that you have, that builders, other—people who purchase—will be looking unduly at initial cost rather than life cycle cost. And if the lending institutions start looking at life cycle cost, that, it seems to me faster than anything else, will cause the third-party purchasers or the builders to start paying attention.

Mr. Cuccinelli. We agree with that. We would wholeheartedly agree with that.

Senator Evans. Mr. Morron, can you try to tell me what the approximate initial cost of the resistance heating necessary to heat the same sized house as the $435—first, what size house, what are the specifications that lead to that $435 case? How big a house and what——

Mr. Cuccinelli. We were taking a typical house of about 1,800 square feet.

Senator Evans. 1,800?

Mr. Cuccinelli. Yes.

Senator Evans. And what weather conditions? Is this primarily heating only? It doesn't have any air-conditioning capacity connected with it, does it?

Mr. Cuccinelli. That is right.

Senator Evans. Heating only. And what kind of climate?

Mr. Cuccinelli. I think the calculation was done on a U.S. average, which would have been 45 100 degree days.

Senator Evans. Mr. Morron, can you tell me offhand—or maybe you would want to do it for the record—what would be the approximate initial cost of resistance heating for that same requirement?

Mr. Morron. Senator, I would like to respond to your question about resistance in writing because I don't have, frankly, the foggi-

460

est notion. But I do have a notion about what it would cost to put a heat pump in a 1,000 square-foot home.

Senator Evans. OK. Now, you said 1,800?

Mr. Morron. Yeah. The heat pump—and we would be talking about the kind of 18.5-percent market share that we were discussing in my oral testimony, the 22,000 btu-an-hour model or roughly in that equivalent. And it would be somewhere in the range of $1,600 to $2,000 for a heat pump which, of course, would provide air-conditioning as well as heat.

Senator Evans. Well, but that doesn't seem to me as comparable because to a simple furnace that is only heating.

But could you give for us the initial investment required for resistance heating for an 1,800 square-foot house, U.S. average, 4,500?

Mr. Morron. Yes, we would be glad to.

Senator Evans. I am just trying to get some idea of whether it is—you know, if I am looking for a cheapie and I have got to make a decision and I don't care what fuel costs—I am a builder—which way am I going to go currently?

Mr. Morron. Along those lines, I think it is worth noting with respect to those installations of resistance heat that are taking place that it seems to us at EEI that the marketplace is moving away from electric resistance furnaces and more toward base-board insulations with individual thermostats in each room for energy-efficiency reasons.

So I would like to submit both those numbers, if that is all right with you.

Senator Evans. That would be helpful.

Does your $435 include the cost of any necessary chimney or flue that would be required?

Mr. Honea. No, sir.

Senator Evans. OK. You better add that into that, if you could do that, and submit for us—in other words, I am trying to get some comparable initial cost and obviously if one has to have a chimney or flue and the other doesn't, that is a cost that has to be included.

Mr. Wiel, I have ignored you with this fascinating back and forth between the two industries.

Do you in Nevada or do any of the regulatory commissions or the utilities—I guess it is really the utilities—pay for efficiency and offer rebates or incentives? That is pretty generally used on the electrical side.

Are you aware of that happening as well on the gas side?

Mr. Wiel. It is not happening on the gas side in Nevada except for strategic marketing purposes by the utility company. But I have a——

Senator Evans. Isn't it true at both sides, strategic marketing, it seems to me that covers precisely what they are doing, getting a better market share.

Mr. Wiel. There are debates that are going on right this very week and last week at hearings for Nevada Power Co., as to what degree the appliance rebates that they are talking about are for conservation purposes and to what degree they are for strategic marketing purposes.

But there are more specific conservation goals available on the electric side, at least in Nevada.

461

Senator EVANS. You did have a footnote, incidentally, some information that you had on the use of those incentives nationally. Could you supply those to us for the record?

Mr. WIEL. Could you be more specific, please?

Senator EVANS. Well, I think that you had a footnote in your testimony that related to the rebate programs and to what extent they are being utilized.

Mr. WIEL. Yes. I will be happy to provide copies of each of the three references in my report.

Senator EVANS. Thank you.

Mr. WIEL. The answer to your question about the gas conservation rebates, my understanding that in California those are being offered. But I have no specific knowledge of that.

Senator EVANS. Mr. Honea, are you aware of that kind of thing?

Mr. HONEA. Yes. Both of our industries do promote energy-efficient homes. We call ours the energy-wise home, and we do have promotional rebates for people that will build that type of home. I think that is good for energy efficiency for the country as a whole.

Senator EVANS. Do you have a program where you bring a third party in here, the oil-heating market—does the gas industry have a program of offering a real cheapie that would shift over the burner and kick out the oil and get in the gas?

Mr. HONEA. Some of the gas companies in the Northeast and the Midwest might. We do not. We have an inducement for new homes.

Senator EVANS. How much of an inducement?

Mr. HONEA. We offer a cooperative advertising program with the builder. And we can go up to $150 a home.

Senator EVANS. On the furnace itself or on the combination of gas appliances?

Mr. HONEA. It is the entire home, including the insulation, weatherization, and the appliances.

Senator EVANS. OK.

On your proposed amendment of 71 AFUE for furnaces rated less than 50,000 btu's, what future date do you feel that it would be appropriate for DOE to review that standard, if it were to be adopted? The legislation calls for reviewing other standards as required by legislation; how about this one?

Mr. HONEA. We would propose the same schedule. and I believe that calls for after initial enactment 5 to 7 years or 1997.

Senator EVANS. Do you feel that if we were to pass legislation that would lay on a requirement of 78 percent, that the industry would respond by figuring out a way to get the 78 percent cheaper than $220 a furnace?

Mr. HONEA. We would certainly hope so. And I know the manufacturers of the industry would dedicate themselves to trying to do that.

Senator EVANS. But you don't know at this time whether there are ways out there to accomplish that?

Mr. HONEA. Not being a manufacturer, Senator, I think the way they would have to do it, they would look for ways to attain economies of scale by making more and more of the same model that would give them labor savings, for example, tooling savings, which would reduce the unit cost hopefully to offset the cost of that extra fan and motor and whatever else.

462

Senator EVANS. OK. Just look through here and see if I have run out of questions. I may run out of questions before I get you guys to all agree on what to do. I fear that that is going to be the case.

What about—we still have a difference of opinion here which doesn't bode well for legislation. Do you have an objection to the requirement that DOE considers there be no incentives for fuel switching when establishing small furnace efficiency standards? Either side or both.

Mr. HONEA. Would you mind repeating it because——

Senator EVANS. Well, do you have any objection to a requirement that DOE consider that there be no incentives to fuel switching when establishing small furnace efficiency standards?

Mr. HONEA. As I understand it, DOE would have a regulation that the utilities could not or the builders or the manufacturers or the dealers of equipment could not offer an incentive, in the form of a rebate or something like that, to attract someone to switch.

Senator EVANS. Perhaps I am not sure how all the incentives might occur. But do I understand correctly that your concern, as it is expressed this morning is that a high efficiency standard for small gas furnaces might create an incentive for consumers to purchase electric resistance heaters rather than small gas furnaces; that is the concern, isn't it?

Mr. HONEA. Yes.

Senator EVANS. If there is some way to try to eliminate that incentive to fuel switching, doesn't that handle a concern?

Mr. HONEA. I am visualizing a situation, Senator, where there is a new home being built and the builder, maybe in conjunction with the homeowner, is trying to make a decision. I don't quite see how one steps in there and provides a disincentive or changes the incentive. I am struggling with that.

Senator EVANS. So am I. I am not sure, either. I am just asking questions.

Mr. Morron, do you have an answer?

Mr. MORRON. Senator, I don't think I have an answer, but I have a suggestion to make that might help clarify matters. And that would be if DOE is to consider a separate standard, that the performance standard, per se, should not be fuel unneutral, should not favor either electricity or natural gas. In short, whatever standard would be produced or whatever number would be produced would be fuel neutral.

That then would leave the question of the relationship of the individual companies and their customers and builders and their potential customers alone and essentially out of the question, if the standard were done on a fuel neutral basis.

Senator EVANS. OK. But I think that is my whole line of questioning during this is try to figure out what is or isn't fuel neutral, even from the estimates of fuel pumps——

There are two ways to look at it. One is the total life cycle cost, and the other is the initial investment. I guess what we are saying is that a lot of people really don't look and they do not act, necessarily, in their best economic interests because they don't look at the total life cycle cost, or a third party is the one who is building the house and opts for what is of interest to that person, which is only the initial capital cost.

463

If that is true, your heat pump isn't going to be a competitor for that size home with the simple gas furnace, in terms of initial cost. Three to four times is expensive; right?

Mr. MORRON. Mr. Chairman, if I might. I heard the discussion earlier this morning about whether or not that energy customers are looking at the long-term implications of an appliance purchase. I heard the testimony that suggested that first cost was the only consideration. And I would like to substantially disagree with that assumption if for the only reason that at least my industry in the past 10 or 12 years has dramatically gotten the attention of its customers over the issue of energy costs.

I don't think first costs are the overriding consideration. I truly believe that as our prices as an industry have increased over the years, our customers have become increasingly sophisticated in the way they decide to purchase an appliance and are, in fact, conscious of first cost but willing in some cases and probably most cases—now, I don't have numbers or whatever to suggest that—but in most cases are willing to spend a little extra because of the long-term implications of energy savings, but most especially with energy-intensive equipment, such as refrigerators and HVAC equipment.

Senator EVANS. Well, that may be true, but let's look at the—it seems to me the biggest market and especially when we are talking about furnaces—heating and cooling a home—aren't purchases made after the home is built? There are purchases that go along with the building of the home.

And so a person goes out to buy a home. Where does that rank in their thoughts about the home? It seems to me that view, neighborhood schools, size, number of bedrooms, bathrooms—everything else under the sun—they look at the whole picture. And I frankly doubt that the question of whether there is an electric resistance heat or small gas furnace is going to be a big factor in their determinations as to whether they buy the home or not.

Mr. MORRON. With due respect, Senator, I would disagree. And I think if I could drag somebody in here from the National Association of Home Builders to talk to you about their last buyer preference and behavior study, they would agree with me when they—I think they would say to you that energy efficiency is still in the top five factors in the purchase of the home, including location, number of bedrooms, and so forth.

Senator EVANS. I would be fascinated.

Mr. WIEL. Mr. Senator, may I respond to that last question?

Senator EVANS. Yes. In fact, I am sorry.

Do you have those rankings available?

Mr. MORRON. Yes, I believe they have been published, Senator. I think we have them back in the office somewhere.

Senator EVANS. If you can run across them or if we can get them, I think they would be useful to help Mr. Wiel.

Mr. WIEL. The third reference in my written testimony addresses the efficiency of the market and it specifically answers—at least tries to answer—some of your questions.

It is a study done by Lawrence Berkeley Laboratory to be published later this year. But I do have a copy of the paper that was submitted. In fact, I have one here, if you would like to take it

464

today, or I will submit it as your pleasure. It contains, for example, some information on the number of third party producers.

A study was done for LBL which showed that 50 percent of the purchases are purchased by people with what they label as a weak incentive to consider energy prices.

Senator EVANS. That is all appliances. Do they separate them all by appliances?

Mr. WIEL. No, they refer to another study and they summarize this. I don't know whether the reference behind this reference contains that separated or not. Fifty percent of all appliances are purported to be purchased by people with a weak incentive, to consider energy conservation.

Thirty seven percent are purchased by people with no incentive and 15—I am leaving something out, but 15 percent are purchased by people with a strong incentive. Let me read you the correct numbers because it is right here. Those are the numbers: 37 and 15. I don't understand why they don't add up. The other 8 percent aren't referenced.

Furthermore, the prime purpose of this study was to look at, from a macro point of view, the overall investment behavior in appliances of the Nation as a whole, and it does it by looking at the opportunities that the purchasers don't accept. They look at the next purchase turned down and what it could have been. And they are showing that people are avoiding opportunities to return from 18 to 825 percent on an extra investment and they are doing it for a number of reasons.

They are not commenting on the individual's decisions. They are saying the marketplace could offer that opportunity, not that it does offer it, but it could offer the opportunity for those returns in the marketplace isn't and instead people are accepting 12 percent return on these billions of dollars by investing in powerplants instead of the appliances.

Senator EVANS. I think both sides tended to agree that there ought not to be in the standard set, whatever we pick, particularly in this field where there appears to be some difficulty, there shouldn't be an incentive in the standards themselves to push people one way or the other.

If we found that—I am not saying we will, but to get to 78 percent that we are talking about, 78 to 85 percent, you have got a $655 bill and it may cost another, say, $150 to build the flue; say that gets you up to $805.

If legitimate analysis showed that the cost of electric resistance heating for that same sized house to install was $805, wouldn't that be a neutral, no incentive either way, and be a legitimate——

Mr. HONEA. Senator, firstly, we are assuming that, which I think would be way off. I think you would have $200, $250 for the electric instead of——

Senator EVANS. That could well be.

Mr. HONEA. But let's assume—you want to assume that it is equal. I think, then, we would argue to go back to the source and look at the efficiency of the fuel that is being used, from a national perspective.

Senator EVANS. Well, how do you do that? What is the efficiency of gas?

ADD-040

465

Mr. HONEA. Well, I think the problem we have there is that we would maintain that the electric resistance heater is not as efficient for the nature as a whole. But I don't know any way to put a penalty on it, if you will, to stop its sale and use.

Senator EVANS. You are saying it is not as efficient simply because the generation of the electricity in the first place is that X percentage efficiency and their line losses to get it from there to the house.

Mr. HONEA. That is right, sir.

Senator EVANS. But isn't the same thing true, the argument from the other side, that if you—and I have seen some analyses that have attempted to do this, to get the whole energy train going clear back to the first punching of a hole for a gas well and the first building of a dam for a hydroelectric plant. I guess it would be a fairly complex operation. And I don't know whose side wins on that.

Mr. HONEA. We think that the overall efficiency on the electric resistance might be as low as 33 percent. And I will be glad to get you some numbers from the AGA studies on the gas. But I believe the gas is much more efficient in getting it to the home, from the well to the home.

Mr. CUCCINELLI. Senator, right now electric resistance heat is less expensive to install than a natural gas furnace. The concern is that the bill is widening that gap; and if there was—I think if you were——

Senator EVANS. If it is less expensive, why does anybody put in a gas furnace?

Mr. CUCCINELLI. Initial cost, comfort. There are several other issues.

Senator EVANS. But initial cost isn't one of them, if you are saying that it costs more?

Mr. CUCCINELLI. In most applications, that is yes. But the delta is very close. And what this bill could do is widen that cap and cause some serious marketing problems.

Senator EVANS. Do you have any estimate at all as to what you really think would happen if a standard like this were adopted in the $220 that you now say is required, to add a draft, what would really happen in the marketplace? You are not going to sit by and let the market go away. You always will do everything you could to reduce that cost.

What is really going to happen? It is not going to be $220. It is going to be some figure a lot lower than that, I would guess.

Mr. HONEA. We would hope. The first attack would be the manufacturing level, and we would hope that at that level and through the distribution channels, that could be narrowed. But I am worried, Senator, that what we are seeing right now is a lot of decisions are being made, based on first costs, contrary to what my colleagues have said, and we are already fighting that battle today. People that are buying these homes with the less efficient type of energy and then being shocked with high bills, and I don't quite see how we can offset the cost of that extra motor and fan and the other controls that go with it, and I fear that while we may reduce that $220, we are still going to be seeing a widening spread.

ADD-041

466

Mr. MORRON. Mr. Chairman, the Electric Institute and its members see no great rush on the part of homeowners in the United States today to move toward resistance electric heating. Quite the contrary. We see an increase in penetration of the heat pump application of electricity for home-heating purposes.

In those high-growth areas, as one might call the South or Sun Belt as defined by the Census Bureau—in fact, we are only seeing a 6-percent penetration of resistance electric heat. So, I don't see the rush that my colleagues on the gas side of the business see.

Senator EVANS. Well, 6 percent. Now, what they are saying is if you increase the cost of the competitive furnace by 50 percent, that the penetration will be a whole lot bigger.

Mr. MORRON. Well, Mr. Chairman, my response to that is that where the growth is taking or the new construction is taking place, as I mentioned earlier, we have an increasing penetration of air conditioning which requires duct work. And at that point the competition is not really between resistance electric heat, which is perceived by the consuming community as an extremely expensive thing to do. And gas furnace—it is a difference between an electric air conditioner and a gas furnace or a heat pump.

And I think that is where the battle is today, and I submit that unless we do something arbitrary through this legislation with respect to standards, that is where the competition is likely to go in the future.

Senator EVANS. Have you worked on some gas-operated heat pump operations?

Mr. CUCCINELLI. There are a number of gas-fired heat pump technologies and field tests right now. But there aren't any into the marketplace. And we don't know what the technical success of those field tests would be. So, that is the best guess.

Another point is the gas furnace was basically the only appliance of all the appliances that took out a tried and true technology, the atmospheric furnace, which there are 30 million or so of them in use operating very well and successfully and are eliminating that technology at a time certain in 1992.

And, basically, the bill then asked the Natural Gas Utility Industry to place all of its marbles on a future technology and future development that isn't quite here today. And having seen what happened to our counterparts when they put a lot of marbles in plant construction based on atoms, we decided that it gives us uneasiness just based on betting on something that isn't here now and it is playing, bet your industry, in essence.

Senator EVANS. But that presumes—when you say it will eliminate, you are presuming that, from the cost figures you have here, or whatever the cost figures end up being, that you won't be able to compete, you won't be able to discover anything, you won't be able to operate.

Mr. CUCCINELLI. What I am saying is when you set the number at 78 percent, you eliminate the atmospheric combustion furnace, and that is a whole class of furnace that presently is 66 percent of the shipment, something like that, total shipment.

And that is the only appliance that has had its shipments gutted like that, and you are taking that whole technology, tried and true, and saying goodbye; we are going to try and develop new technolo-

467

gy, bring the cost down on some technology that is in the market-place.

And so it is a risk that we are being asked to take, too.

Senator EVANS. It has been a very interesting and worthwhile exchange. We are still a short distance from the end of the session. There is a very large group that would like to see some standardization come out of what we are going to do. The penalty for not doing anything, of course, is to have the Department of Energy and the courts decide what the future will be and I do not think that either or both of those are necessarily to be desired.

Mr. CUCCINELLI. Senator, we were involved in the late night negotiations also last night, and it was our understanding as of last night that the manufacturers did not want appliances to be separated out, if possible, to DOE ruling which would then have the State exemption because it makes moot the initial objective that they had for a Federal market.

And it was my understanding that that stipulation by EEI was causing the manufacturers some concern, and hence our proposal in our testimony would be consistent with the primary objective and goals of the manufacturer of having a Federal market.

Senator EVANS. Which one? The first or the second alternative? Either of the alternatives or the first alternative?

Mr. CUCCINELLI. The first alternative complies more with that objective.

Mr. MORRON. Mr. Chairman, there is something in what Mr. Cuccinelli says here. Amongst all the proposals that went back and forth amongst us last night, I think it is worth noting what I was told by—we were working through intermediaries because I knew if I proposed something to Ken, he was going to see it tainted with the electric brush and so forth.

Senator EVANS. Why don't you eliminate the intermediaries and just get together?

Mr. MORRON. That is right. Well, sometimes what makes logical sense does not really work out. But in this case what the manufacturers were expressing to EEI as their concern with the proposal that I advanced here this morning was that in the case of the 45,000 Btu per hour and below gas furnaces, this would delay the date certain that they, as manufacturers, would be able to plan for by 1½ years over that which is currently contained in the legislation.

EEI's position with respect to their concern was to share it and to understand the agony of regulatory delay but to point out to them that we felt very strongly that unless we could reach some sort of an agreement, this bill was likely to get fouled up somehow and go down. And we wanted those standards established, essentially saying to both the House and the Senate that there is no reason for either of you at this point to believe Mr. Cuccinelli or myself, and why don't you resolve this difference in the hands of energy professionals in the Department of Energy.

And that, last night at 10 o'clock seemed to satisfy the manufacturers. Now, perhaps there have been subsequent communication that would reverse that, and I would not doubt it a bit. But that is where we were last night.

Senator EVANS. Any comment from the other side?

ADD-043

468

Mr. CUCCINELLI. It was just my understanding as of a few minutes ago that that was a problem with the manufacturers.

Senator EVANS. I guess we need to go back to the drawing board for at least a few finishing touches, or at least to find out kind of where everybody is.

We do appreciate your testimony and the help that has been given. There is not much time left and there may be some who prefer to have the courts set the standards which they most certainly will do because I do not see DOE moving very fast to accomplish the task.

I greatly admire the judiciary. I think that they are marvelous to settle court cases, but they are not very good at either legislative or executive action, which is what they are being asked to do here.

OK. Thanks very much. With that, there is no more testimony. The hearing is adjourned.

[Whereupon, at 12:48 p.m. the hearing was adjourned.]

[Responses from the Natural Resources Defense Council and additional statements for the record follow:]

22

and (3) amended standards are cost effective. A petitioner may appeal the denial of a petition in Federal District Court.

The intention of these amendments is to eliminate DOE's duty to conduct rulemakings pursuant to a rigid schedule dictated 15 or more years in advance. It is not intended to create any presumption that the need for revised standards will be diminished in the future. The Committee expects DOE to evaluate on a continuing basis whether further revisions in the standards are justified.

*Criteria for New or Amended Standards.*—Section 5 of the Act (new EPCA section 325(l)) also provides the criteria for prescribing new or amended Federal standards. The basic criterion for prescribing the standards is the same as that in current EPCA, *i.e.,* that any energy conservation standard shall be designed to achieve the maximum improvement in energy efficiency that is "technologically feasible" and "economically justified." H.R. 87 incorporates these requirements of existing law, and in addition establishes three additional criteria or factors to be considered by DOE in prescribing new standards or in reviewing standards for possible revision. These new provisions are:

*1. New Section 325(l)(l).*—DOE may not prescribe an amended standard that increases maximum allowable energy use or decreases the minimum required energy efficiency of a covered product. The purpose of this requirement is to prevent the Secretary from weakening any energy conservation standard for a product, whether established in this Act or subsequently adopted. This serves to maintain a climate of relative stability with respect to future planning by all interested parties. The Secretary may find in a particular case that no revision of a standard is required.

*2. New Section 325(l)(B)(iii).*—If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard would be less than three times the value of the energy savings that the consumer will receive as a result of the standard during the first year, a rebuttable presumption is created that the standard is economically justified. In other words, standard levels with a simple payback period of three years or less are entitled to a presumption of economic justification. The fact that this payback level cannot be achieved by a standard level shall not be considered in the Secretary's determination whether a standard level is economically justified. In other words, the Secretary shall not presume that a standard level is not economically justified just because the simple payback period exceeds three years. Instead, the Secretary shall analyze savings in operating costs as required by Section 325(l)(2)(B)(i)(II).

*3. New Section 325(l)(4).*—In addition to the technical feasibility and economic justification criteria, this new section ensures that energy savings are not achieved through the loss of significant consumer features. The provision states that even if a standard is "technologically feasible" and "economically justified," the Secretary may not prescribe an amended or new standard if he finds that interested persons have established by a preponderance of the evidence that the standard is likely to result in the "unavailability in a covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the

23

United States at the time of the Secretary's finding." This term precludes DOE from promulgating a standard that manufacturers are only able to meet by adopting engineering changes that eliminate performance characteristics. A manufacturer's decision to eliminate such characteristics rather than to implement other technologically feasible changes does not render the product type "unavailable." A standard would result in the "unavailability" of characteristics, etc., if, as a result of the standard, a product containing such characteristic would become prohibitively expensive, *i.e.* if there would be minimal demand for the product having such characteristic. Nor does the inability of a particular manufacturer to meet a standard necessarily make the product type "unavailable."

The purpose of this provision is to ensure that an amended standard does not deprive consumers of product choices and characteristics, features, sizes, etc. Significant achievements in energy conservation can be made without sacrificing the utility or convenience of appliances to cosumers. A valid standard may entail some minor loss of characteristics, features, sizes, etc.; for this reason, the Act requires that "substantially the same," though not necessarily identical, characteristics or features should continue to be available. This provision also does not apply to trivial effects in which a standard might result. If a standard level for a given product type or class fails to meet the statutory criterion, the Secretary should determine the most stringent standard level that would satisfy the criterion for that product type or class and adopt a standard for it that meets the statutory criteria. In addition, the Secretary may make adjustments to the standard levels for certain product types or classes to meet this requirement (*e.g.,* setting a lower standard level for certain types or classes), and the failure of particular product types or classes to meet this requirement shall not affect the Secretary's determination with respect to other product types or classes.

The burden of producing evidence and proving that a standard level will result in the unavailability of certain characteristics, etc., rests on interested persons asserting the claim of unavailability.

Product types or classes are those defined by the Act or by the Secretary. Examples of "performance characteristics" of particular products are: safety; cooling; refrigeration and heating; dehumidification; ability to clean or dry without adverse effects; serviceability; and incidence and cost or repair. Examples of "features" are: automatic defrost, through the door ice, size of room air conditioners, and noise levels. Assessment of standard sizes (*i.e.,* the availability of sizes that fit in standard building spaces), capacities and volumes should be based on a review of products available in the marketplace.

*Section 7. Effect on Other Law*

*Overview.*—Section 7 provides for preemption of certain State and local regulations that address the energy consumption of covered products. In overall form, the section follows substantially the preemption requirements in current EPCA. Thus, the section continues the current rules for preemption with respect to certain State testing and labeling requirements applicable to covered prod-